OLIVER LEMON PECK

*v.*

SEID BEZ

(No. 9832)

Submitted September 24, 1946. Decided October 22, 1946.

*John Q. Hutchinson, Clay S. Crouse* and *Grover C. Trail,* for plaintiff in error.

*W. A. Thornhill, Jr., Lilly & Lilly* and *R. G. Lilly,* for defendant in error.

RILEY, JUDGE:

Oliver Lemon Peck instituted in the Circuit Court of Raleigh County this action of trespass on the case against Seid Bez to recover damages for an alleged wilful, intentional, and unlawful assault and battery on plaintiff. To the judgment in the amount of $23,416.00 in plaintiff's favor, based upon a jury verdict, this writ of error is prosecuted.

The declaration alleges that on May 8, 1944, "* * * in the town of Sophia, Raleigh County, West Virginia, the said defendant, acting without any legal justification or excuse, made a willful and intentional trespass on the person of the plaintiff, and wilfully, deliberately, intentionally, unlawfully, assaulted and beat the plaintiff, in consequence of which the plaintiff was seriously, painfully and permanently injured * * *"; that by reason thereof "* * * the plaintiff then did, ever since has, and in the future will continue to suffer great physical pain, mental anguish and nervousness"; and further damages are alleged in the cost of surgical and medical treatment, and for the disability of plaintiff to follow his usual occupation and loss in time and services, and reduction in future earnings. Defendant filed his plea of the general issue and a special plea alleging self-defense.

Plaintiff testified that on Monday, May 8, 1944, between ten and eleven o'clock at night, he saw defendant coming out of a theater on the main street of the town of Sophia. As defendant turned to the right to go to-

ward a building owned by him, known as the Bez Building, situate on the same side of the street as the theater and separated therefrom by a narrow street twelve feet in width, plaintiff approached defendant and asked him to cash a check for four dollars. When defendant told plaintiff that he did not have the money, plaintiff replied, "Thank you, Allah is just." As plaintiff started walking to the door which led to his brother's dental office in the Bez Building, defendant grabbed him by the neck, pushed him to the ground, saying at the same time that he was going to kill him for breaking his "banister", and when plaintiff was on the ground, defendant raised his knee and "caught" plaintiff in the groin, whereupon plaintiff felt "something give", and then defendant turned plaintiff over and kicked him in the back.

According to plaintiff's testimony, defendant's witnesses, Stephen and Hattie Sokola, who had left the theater with Bez and had proceeded toward their apartment in the opposite direction, turned back and came to the place where plaintiff and defendant were engaged in a fight; that Sokola told defendant to let plaintiff up; that after plaintiff got up he could not stand, and he asked the Sokolas to take him home, and told them he was hurt; and that at the Sokolas' solicitation, Bez put plaintiff in the back seat of his car, and with defendant driving and the Sokolas in the front seat, plaintiff was taken to his brother's home, where he lived, and was carried into the yard. Perry Haga, chief of police of Sophia, having been called at Dr. Peck's request, he and Dr. Peck accompanied plaintiff to the jail in Beckley, where he was confined to a cell until the next morning.

But the account of the affray given by Bez and the Sokolas differs materially from plaintiff's version. They testified that they left Bez in front of the theater, the latter going past Peck toward defendant's building; that plaintiff was intoxicated and accosted defendant and asked him for money, which request defendant refused; that as defendant walked past plaintiff, the latter put his arms around defendant, whereupon defendant grasped

plaintiff by the shoulders and held him. According to defendant and his two witnesses, plaintiff apologized and thereafter they took plaintiff to his brother's home in defendant's car, after which plaintiff was taken to jail.

Defendant and Sokola testified that the trouble occurred on Sunday night, May 7. On cross-examination Sokola stated he remembered it was Sunday night, because Sunday night was the only night in each week when he and his wife made it a practice to go to the movies. Mrs. Sokola and Perry Haga, the chief of police of Sophia, were unable to recall whether the difficulty occurred on Sunday or Monday.

There is substantial evidence in the record to the effect that plaintiff was intoxicated on the afternoon and evening of the day he was injured. Plaintiff denies that he was intoxicated on that afternoon and evening, but says that he had one or two drinks and some beer during the afternoon and was just getting over a "drunk".

. Sokola testified that after he and his wife separated from Bez at the theater door, and "he had walked twenty-five or thirty feet in the opposite direction from Bez as he turned to the right there", he heard scuffling on the street, and turning saw plaintiff with his "hands around from the back", and it seemed to witness that plaintiff was holding defendant's shoulders, "they were dancing around and scuffling around", and for a minute they went into the vestibule of the Bez Building. When witness got there the fracus was over, and defendant was holding plaintiff by the shoulders telling him to behave, and plaintiff was heard to say, "* * * it's my fault, and I am sorry. Will you please forgive me?" Sokola contradicted plaintiff's testimony that defendant had him down and was choking him. Witness said that he asked Bez to take plaintiff home, and thereupon defendant took plaintiff by the arm and helped him into the back seat of the Bez car.

Mrs. Sokola testified that as she and her husband were walking away from the theater, she heard a "shuffling noise * * * like your feet would make on the pavement, * * * and saw somebody going round and round in the vestibule" of the Bez Building; that when she and her husband came to the place where the men were struggling in the vestibule, the trouble was over and both men were standing up, Peck repeating that he was sorry. This witness further testified that after the men were parted, plaintiff "couldn't walk very good"; that defendant took hold of plaintiff's arm and helped him to the car; and that all four then drove to Dr. Peck's house. When they arrived at the house, defendant caught plaintiff by the arm and helped him into the yard. Witness testified, "He [plaintiff] walked."

Evidently for the purpose of showing that plaintiff did not receive his injuries at defendant's hands, the latter produced four witnesses: J. H. Goodman, Elsie Dameron, Millard Dameron, and Bill Brosky, who testified to the effect that on Saturday night, May 6, 1944, plaintiff fell down the stairs which lead from the ground floor to the second floor of the Bez Building. Brosky also testified that he saw plaintiff "the evening before" the difficulty, heard him complain of his leg, and say that "he had fell down some stairs."

To counter this theory, plaintiff, while admitting that the baluster had been broken since the Saturday night before the affray, denied that he had fallen down the stairs and introduced several witnesses who testified as to his condition after the time defendant claims plaintiff received his injuries as the result of having fallen down the stairs of the Bez Building. Dr. A. J. Scheppe, a dentist having an office in the Bez Building in Sophia, testified he saw plaintiff walking down the streets of Sophia between eight-thirty and nine-thirty in the evening of Monday night, May 8, which was the day upon which the trouble occurred; that he did not notice anything unusual about plaintiff's walk or carriage, and that so far as witness could see, plaintiff was not limping. Henry Smith,

a store manager in Sophia, saw plaintiff in front of the theater between nine and ten o'clock on the evening of May 8, and, though about two feet from him, he saw plaintiff walk on the street and did not observe that he limped. Dr. Peck testified that plaintiff worked at his office on Monday, May 8, and that he showed no sign of limping.

Bez denies that on the evening of May 8, he struck and choked plaintiff and forced him to the ground. He says that plaintiff called him a "Hunky son-of-a-bitch". He testified that when Sokola came to the vestibule, he had his hand on plaintiff's shoulders "* * * trying to get him to be quieted down"; that "* * * he was standing up, and he walked to Steve and asked him to take him home". (Italic supplied). In answer to the inquiry whether plaintiff walked to Sokola, defendant answered, "Yes, sir," and, further, he testified that no one had hold of plaintiff at that time.

Plaintiff testified that throughout the night of his confinement in jail, he suffered severe pain, and with the use of a tin cup, which he hit against the bars of his cell, he tried in vain to attract someone's attention. When morning came, a doctor was summoned, who gave plaintiff medicine and directed that he be taken to the Beckley Hospital. An ambulance was called, a cart was brought to the cell, and plaintiff was carried to the ambulance and driven to the hospital, where he was placed under the care of Dr. Ralsten, a specialist in orthopedic surgery. X-rays were taken and three days later plaintiff was driven in an ambulance to the United States Veterans Hospital in Huntington. For the purpose of making the trip to Huntington, plaintiff's leg was put in a "Thompson" splint, and fastened to the top of the door of the ambulance. Dr. Peck accompanied plaintiff to the hospital, and the x-rays taken at Beckley were turned over to the doctors there. At Huntington an operation was performed on plaintiff's left leg, which operation required about three hours, during which plaintiff was under an anaesthetic which did not render him unconscious.

After the operation plaintiff's entire left leg was placed in a cast which covered his foot and thigh, and encased his torso to a point just below the arm pits. Plaintiff remained in this cast for about two months. When the cast was removed, he testified that he had no control of his foot movements, and the leg was again placed in a Thompson splint. While he remained in the cast, plaintiff testified he suffered severe pain about his left hip and pelvis. He was released from the Veterans Hospital in September, 1944, and was taken in an ambulance to his brother's home in Sophia, where he remained until November, when he was again taken to the Veterans Hospital, remaining there until December 23, 1944, when he was returned to his brother's home in an ambulance. In the following February, he was again taken to the hospital in Huntington, where x-rays were taken, and he was returned to his brother's home in the same way. On an average of once every sixty days since September, 1944, he has been taken by ambulance to the hospital in Huntington.

Plaintiff testified that he constantly suffers pain; that he cannot sleep, or sit down in a normal position or walk without the aid of crutches or a stationary support. Dr. Ralsten of the Beckley Hospital testified that an examination, made immediately after plaintiff's admission to the hospital, revealed that plaintiff had a dislocation of the left hip, and a fracture of the left femur and pelvis; that the x-ray showed that the head of the left femur had been dislocated from its socket; and was broken off and shoved approximately two and a half inches into the groin and away from the neck of the femur; that there is a wasting of the muscles of the left thigh and calf; that measurements of the left leg showed it to be one-half inch shorter than the right leg, which is due to the fact that the remainder of the neck of the femur was placed in the acetavulum cup which, according to Gould's Medical Dictionary, Scott, 3rd ed. 11, is a cup-shaped depression for the reception of the head of the femur. Dr. Ralsten testified further that plaintiff had a long scar,

approximately ten inches in length, on the left hip extending up on the abdomen and down to the thigh, which is the usual place for the operation necessary for the removal of the head of the femur; and that plaintiff's left testicle is considerably smaller than the right and very tender, there being an injury to the nerve supply of the left testicle, which, in the opinion of the witness, was the result either of the injury or incident to the operation which defendant underwent. According to Dr. Ralsten, after the head of the femur was placed in the acetavulum cup, the left leg at that place was put in a cast and thus immobilized. It is Dr. Ralsten's opinion that plaintiff has suffered permanent injury and will never again have full use of his left leg.

Defendant's initial position is that the verdict was against the weight and preponderance of the evidence. This position is not tenable in view of the evidence of both plaintiff and defendant to the effect that as Bez and the Sokolas parted at the theater, Bez going to the right in the direction of his building, Peck approached the former, so it must be said that even if Peck had fallen down the stairs of the Bez Building on the Saturday night before the encounter, he was not injured to such extent on that occasion that he was rendered unable to walk; yet the uncontradicted evidence shows that, immediately after the encounter, plaintiff was taken to his brother's house and thence to the county jail where he was confined until the following morning, when a medical examination disclosed that he was so severely injured that it was necessary to take him in an ambulance to the Beckley Hospital and the medical examinations there and at the Veterans Hospital in Huntington, supported as they are by x-rays, disclosed that the head of the femur was dislocated, broken from the neck of the femur, and forced about two and a half inches into the intestinal cavity. Dr. Ralsten testified that plaintiff's physical condition, as disclosed by the initial examinations at the Beckley Hospital, was such that plaintiff could not have walked, as witnesses say he did immediately before and after the

scuffle. Plaintiff's medical evidence remains uncontradicted in this record. It follows that the defendant's testimony to the effect that, as Sokola and his wife arrived at the place where the plaintiff and defendant were engaged in the scuffle, plaintiff walked to Steve Sokola and asked him to take him home, is incredible and the jury so found. In our opinion, on the basis of this record, plaintiff's injuries could not have been incurred in any other manner than as the result of the struggle in the vestibule of the Bez Building. In view of the great severity of plaintiff's injuries, we think the jury had a right to solve in plaintiff's favor whatever conflict there is in the evidence as to what happened in the vestibule at the instant the injuries were incurred, and there is such a conflict in the evidence as to what led up to the encounter that the jury's finding, in our opinion, is not against the clear preponderance of the evidence on that point.

In our opinion, the trial court erred, as suggested in defendant's second ground of error, in permitting Dr. Schnitt to answer as to "What are the possible outcomes that may result, in your opinion" of plaintiff's injury? The "reasonable certainty rule", which prevails in many jurisdictions, has been adopted in this jurisdiction as the proper basis of a legal recovery for future permanent consequences of a personal injury. In point 2, syllabus, *Wilson v. Fleming,* 89 W. Va. 553, 109 S. E. 810, this Court said, "* * * it must appear with reasonable certainty that such [future permanent] consequences will result from the injury. Possible or probable future injurious effects are too remote and speculative." The rule, however, is otherwise where, as in *Thomas* v. *Monongahela Valley Traction Co.,* 90 W. Va. 681, 112 S. E. 228, the plaintiff in a personal injury action seeks to elicit from a medical expert an opinion whether disabilities which have already ensued and which have followed immediately upon the injury were the consequence thereof. The distinction is well stated by Judge Ritz, in the opinion in the latter case at page 687: "If the plaintiff

in this case was seeking to recover damages for some disease with which he expects to be afflicted in the future, as a result of the injuries he received, then those authorities [cited in the *Wilson* case] would have application. This he is not trying to do. His attempt to recover here is for disabilities which have already ensued, and which followed immediately upon his receiving the injuries, responsibility for which he attempts to fix upon the defendant." A careful collation of authorities may be found in the note to *Coppinger* v. *Broderick,* 37 Ariz. 473, 295 P. 780, 81 A.L.R. 419, Notes 423 to 472, inclusive. "To entitle a plaintiff to recover present damages for apprehended future consequences [of an injury], there must be such a degree of probability of their occurring, as amounts to a reasonable certainty that they will result from the original injury." Sedgwick, Damages, 9th ed., Section 172.

It is further contended on this writ of error that the trial court erred in refusing to permit defendant to testify that he had no intention to injure plaintiff, and in instructing the jury to disregard defendant's voluntary answer in the negative. In this action plaintiff sought to recover punitive damages, and as a basis for such recovery the declaration charges that the alleged attack was wilful, intentional and unlawful. In Jones on Evidence, Civil Cases, 3d ed., Section 170, the rule is stated: "But it is the prevailing rule, sustained by the great weight of authority, that whenever the motive, intention or belief of a person is relevant to the issue it is competent for such person to testify directly upon that point, whether he is a party to the suit or not." See also syllabus *Brightwell* v. *Simpson,* 106 W. Va. 471, 146 S. E. 383. But, in our opinion, the trial court's ruling on the immediate question was not prejudicial error for the reason that after the ruling on the question, and the court's admonition to the jury to disregard defendant's voluntary answer, counsel for defendant inquired of defendant, "Did you try to injure him, or hurt him in any way", to which defendant answered in the negative.

There was no objection to either the question or the answer. We think the words "try to" import an intent and that the error complained of was cured by this latter question and answer.

Defendant's counsel further contend that though plaintiff asked for punitive damages in his counsel's closing argument, such damages cannot be awarded unless there is a clear showing of malice. It is contended that *actual* malice would have to be shown before defendant's financial condition could be exposed. In *Jopling* v. *Bluefield Water Works & Improvement Co.*, 70 W. Va. 670, 74 S. E. 943, 39 L.R.A. (N.S.) 814, this Court held that to sustain a claim for punitive damages the wrongful act must have been done maliciously, wantonly, mischievously, or with a criminal indifference to civil obligations. In *Pendleton* v. *Norfolk & Western Railway Co.*, 82 W. Va. 270, 95 S. E. 941, this Court held, in effect, that where there is evidence from which a jury may conclude that defendant acted with malice toward plaintiff or with reckless and wanton disregard of plaintiff's rights, punitive damages may be awarded. We think that if plaintiff's version of the affray is true, as the jury had a right to find, and did so find, defendant's actions being unlawful, wilful and intentional, as alleged in the declaration, were such that a jury could infer that such actions were "with reckless and wanton disregard of plaintiff's rights", and it was on the theory that plaintiff was entitled to recover punitive damages that his counsel were permitted to examine defendant as their own witness and in detail as to his financial worth. This examination included testimony as to various pieces of real property which defendant owned, his estimate of their values, the amount of defendant's personal property, and the amount of defendant's debts. This evidence, in our opinion, was pertinent to the issue whether plaintiff in the circumstances of this case was entitled to recover punitive damages. In the *Pendleton* case it was held that where it is proper to award punitive damages, the jury may consider the station of the parties and the financial and so-

cial standing of defendant to determine what would be adequate punishment.

The trial court's rulings in giving over defendant's objections, plaintiff's instruction No. 3, and in refusing defendant's instructions Nos. 9 and 10 are also cited as error. Plaintiff's instruction No. 3 reads as follows:

"THE COURT FURTHER INSTRUCTS THE JURY THAT if you believe from a preponderance of the evidence in this case that the plaintiff is entitled to recover damages from the defendant, you should take into consideration the nature and extent of the injuries, if any, sustained by plaintiff from defendant, and whether or not such injuries, if any, are permanent, his loss of earnings, if any, to the present time, and such loss of earnings, if any, as he may reasonably be expected to sustain in the future, by reason of any injury, if any, shown by the evidence to have been inflicted upon the plaintiff by the defendant, and you should further take into consideration the physical pain and mental anguish, and suffering if any, which the plaintiff has suffered or may reasonably be expected to suffer, and allow said plaintiff such damages as you believe him justly entitled to from all the evidence in the case, not to exceed the sum of Fifty Thousand Dollars ($50,000.00)."

It is contended that this instruction is binding and that by the concluding clause of the instruction the jury is invited to find for plaintiff without regard to whether he was injured by defendant. It is suggested that the limitation of the verdict to fifty thousand dollars, without any mention of compensation for injury or damages by way of punishment, is erroneous. *Hess* v. *Marinari*, 81 W. Va. 500, pt. 5, syl., 94 S. E. 968, is cited to the effect that punitive or exemplary damages should bear a reasonable proportion to the actual damages shown. At the trial the instruction was objected to on the ground that it is abstract. Here one of the objections to the instruction is that it is binding. Under Rule vi (e) of the Rules of Practice and Procedure for Trial Courts, promulgated by this Court, specific grounds of objection to instructions

only will be considered. Counsel cannot with propriety take the position in the trial court that plaintiff's instruction No. 3 is objectionable because it is abstract, and in this Court say it is objectionable because it is binding. The instruction should be read as a whole and so reading it, in our opinion, the concluding clause, does not, as defendant's counsel suggest, invite the jury to find for plaintiff unless the jury believes from a preponderance of the evidence that plaintiff is entitled to recover damages for the alleged injury. Nor is the objection, that the instruction contains an admonition to the jury that the verdict shall not exceed fifty thousand dollars, tenable. Point 8, syl., *Keathley v. Chesapeake & Ohio Railway Co.*, 85 W. Va. 173, 102 S. E. 244; *Looney v. Norfolk & Western Railway Co.*, 102 W. Va. 40, pt. 2, syl., 135 S. E. 262, 48 A.L.R. 806; and *Nees v. Julian Goldman Stores*, 109 W. Va. 329, 342, 154 S. E. 769. As heretofore suggested, the allegations of the declaration are broad enough and the evidence bearing on the question whether defendant's alleged attack on plaintiff was wilful, intentional, and unlawful sufficient for the jury to award punitive damages. The correct rule for the allowance of exemplary damages is that they may be allowed in a case in which there is sufficient evidence from which the jury may conclude that the defendant acted with malice toward plaintiff or with reckless and wanton disregard of plaintiff's rights, and such damages may be in such amount as, taken together with the compensatory damages, will be sufficient to punish defendant and deter others from like offenses. *Pendleton v. Norfolk & Western Railway Co., supra; Goodman v. Klein*, 87 W. Va. 292, 104 S. E. 726. And where defendant did not by a request for the submission of interrogatories ask for a separation by the jury of compensatory from punitive damages, punitive damages may be obtained under a general verdict. *Show v. Mount Vernon Farm Dairy Products Co.*, 125 W. Va. 116, 23 S. E. 2d 68, 72. Nor do we think the objection to the instruction on the ground that it embraced mental anguish is sound. If plaintiff's

evidence is true, he suffered severe and excruciating pain, and the jury could well find that when he lay neglected and incarcerated in the jail at Beckley throughout the night, he suffered both physical pain and mental anguish.

The trial court properly refused to give defendant's instruction No. 9. This instruction is fully covered by defendant's instructions Nos. 3 and 7. Likewise defendant's instruction No. 10, which told the jury that "* *.* intoxication and drunkenness may be considered in passing on the credibility of witnesses * * *", should the jury believe that intoxication at the time of the occurrence of the matters to which they have testified, was properly refused for the reason that the question of the credibility of witnesses is fully covered in defendant's instruction No. 6, and for the further reason that the instruction singles out and lays undue emphasis upon particular evidence bearing upon the credibility of plaintiff as a witness, to the exclusion of other factors which may be considered by the jury in considering such credibility. *Tompkins* v. *The Pacific Mutual Life Insurance Co.*, 53 W. Va. 479, 44 S. E. 439,

Counsel for defendant further complain of the efforts of plaintiff's counsel in the opening statement and the examination of witnesses to prejudice the jury. It is contended that counsel tried to place defendant in an unfavorable light before the jury by comparing plaintiff's nativity with defendant's foreign extraction, and seeking to inject into the case the fact that defendant is a Mohammedan. As would seem to appear from the instruction which the court gave on its own motion during the opening statement, plaintiff's counsel made some reference to defendant's religion and the expression attributed to plaintiff, "Allah is just". No objection was made to these references in the opening statement, and yet the court instructed the jury to disrgard counsel's statement as to defendant's religion. It is further contended that in plaintiff's direct examination counsel sought to make an improper comparison between the

nativity of plaintiff and of defendant, and unduly stressed defendant's religion. In their brief defendant's counsel refer specifically by page number to questions which sought to and did elicit from plaintiff the fact that he was born and reared at Hinton, West Virginia, lived at Sophia, moved to Huntington, and then returned to Sophia, where he was living at the time of the trial. No objection was made to these inquiries and answers, nor would any valid objection lie. Plaintiff testified, without objection, that he served in World War II as a dental technician, and the court sustained an objection to an inquiry concerning plaintiff's service in World War I. Objection likewise was sustained to the question whether plaintiff had volunteered or was drafted in World War II, and the jury was instructed to disregard the question. An objection also was sustained to the inquiry on plaintiff's direct examination concerning defendant's religion, and the jury was instructed to disregard the statement of counsel for plaintiff in the presence of the jury in asking for the admission of the evidence sought to be introduced. On the other hand, defendant's counsel were persistent in their efforts to besmirch plaintiff's character. Such counsel sought to show, without any justification, that plaintiff was accustomed to the use of intoxicating liquors to excess, and defendant's counsel on defendant's direct examination brought out defendant's nativity and his present nationality. Thus, defendant was permitted to answer affirmatively the question addressed to him by his counsel, "Are you a citizen of this country", and in the negative the question, "Are you a Hungarian?" To the latter question defendant answered in part: "I am born in Syria but I am an American citizen. Been in this country all my life." During plaintiff's direct examination objections of defendant's counsel were so persistent, frequent and argumentative that the court was prompt to admonish counsel, and at one time reminded counsel, "You are not making a speech to the jury". Objections were sustained to most of the inquiries of plaintiff's counsel, which would seem to be objectionable, and the trial court diligently

charged the jury to disregard the objectionable questions and statements of counsel. Perhaps these happenings during the taking of testimony do not constitute prejudicial error. They, however, have no place in the trial of this case, and upon a new trial being had, counsel on both sides should not again engage in the antics shown by this record, which are entirely violative of the decorum which should surround the conduct of a trial by jury.

And finally defendant's counsel say that defendant was prejudiced by the closing argument of plaintiff's counsel. Again in this closing argument, as in the examination of witnesses, counsel compared plaintiff's nativity with that of defendant and by innuendo, if not by direct expression, stressed and emphasized defendant's religion. These matters, of course, were not pertinent to the matters in issue and had no place in the argument. But again defendant's counsel persisted in making many objections and, without making objections, improperly interrupted the argument of counsel for plaintiff.

Plaintiff's counsel told the jury during the course of the closing argument: "You get a fellow like that who has filched out eighty thousand dollars from the people over there". The court overruled the objection to the statement of plaintiff's counsel, with the remark to the jury that: "* * * counsel I think possibly have more or less leeway in regard to things like that. I do not believe that any statement would be misconstrued by the jury." The ruling of the trial court in this regard was clearly erroneous and the remarks of counsel were designed to prejudice the jury. "Filching" means: "To steal secretly or underhandedly money; (commonly that which is of little value) * * *". Webster's New International Dictionary, Second Edition, Unabridged, page 945. The meaning of the word is commonly known. Counsel's remarks, in substance, told the jury that defendant obtained eighty thousand dollars from the people of the community in which he lived by stealth and pilfer. The

circuit court, in our opinion, committed reversible error in overruling defendant's objection to these latter remarks of plaintiff's counsel.

It should not be necessary for this Court again, as it has done in opinions on numerous other occasions, to condemn practices such as were engaged in by counsel during the course of this trial. The conduct of counsel was improper and tended to violate the dignity and integrity of the trial court. Both senior counsel in this case, veteran adversaries as they are, perhaps were carried away by their zeal in the interest of their clients, but from their long and honorable experience in the courts of this State, they should have known that their conduct went beyond the scope of the issues which were before the court and the jury.

We are of the opinion that the trial court erred, and therefore we reverse the judgment, set aside the verdict, and award defendant a new trial.

> *Judgment reversed; verdict set aside; new trial awarded.*