**FILED**

**July 19, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 20-0206** (Mercer County 18-F-161)

**Roena Cheryl Mills,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Roena Cheryl Mills, by counsel Robert F. Evans, appeals the January 23, 2020, order of the Circuit Court of Mercer County that denied her motion for a new trial, and the January 28, 2020, order sentencing her to life in prison without the possibility of parole for her conviction on one count of first-degree murder. The State of West Virginia, by counsel Andrea Nease Proper, responds in support of the circuit court's order.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Before dawn on April 1, 2018, an officer responded to the residence of Greg Shepherd on Eden Valley Road in Lerona, West Virginia, in regard to an unwanted guest complaint. The "guest" was later identified as petitioner Roena Cheryl Mills. Mr. Shepherd said petitioner walked out of the woods but refused help and refused to leave his property. Mr. Shepherd's fiancée called the police. When the officers arrived, they observed that petitioner was covered in blood, had a bloody glove on one of her hands, seemed intoxicated, and appeared to be talking to an imaginary person. The officers arrested petitioner after she became combative.

Later that same day, the police received a call regarding a possible homicide at 500 Clover Lane in Lerona, West Virginia. That address is located within a quarter of a mile of Greg Shepherd's Eden Valley Road property. The police entered the 500 Clover Lane property and found a headless body, later determined to be the body of Bo White (the "victim"), who resided at that address. Also that same day, Greg Shepherd found Bo White's head on Mr. Shepherds' property near the spot where petitioner walked out of the woods. It was later determined that petitioner was dating both the victim and the victim's father, Jimmy White, and that all three were involved in drug activity.

1

A Mercer County grand jury indicted petitioner for the first-degree murder of Bo White. At a May 20, 2019, competency hearing, the State noted that petitioner had twice undergone psychiatric evaluations and, both times, been found competent to stand trial. Various counsel were appointed on petitioner's behalf; ultimately, Sidney Bell and Shannon Baldwin represented petitioner at trial, which commenced on December 3, 2019.

At trial, Bo White's mother testified that her son had health conditions that made him sickly or weak. The mother also testified that on April 1, 2018, she received a call that no one had heard from the victim. In response, the mother went to the victim's home, found petitioner's van in the driveway and her son's headless body inside the home.

Greg Shepherd testified as follows: At about 6:00 a.m. on April 1, 2018, his dog alerted him to something in the woods. Mr. Shepherd said he went outside and saw petitioner who claimed she was lost, had run out of gas, and that she was supposed to meet "Uncle Joe." Mr. Shepherd stated that petitioner refused to allow him to take her to a gas station and refused to leave his property. Mr. Shepherd testified that it was daylight when Deputy Conner arrived and that both he and the deputy could then see that petitioner was covered in blood. Finally, Mr. Shepherd testified that the victim's residence was a quarter mile away from his home and, that during the afternoon of April 1, 2018, he found the victim's head in the woods near his home.

Deputy Jamie Connor testified as follows: He received an "unwanted guest" call on April 1, 2018. When he arrived at Greg Shepherd's property, he saw petitioner covered in blood and wearing a bloody glove on one of her hands. Deputy Connor stated that petitioner appeared to be intoxicated or under the influence of some substance and was talking to herself. Deputy Connor said petitioner claimed her name was "Cheyanne Martin" and that she was bloody because she had been thrown through a glass door. Deputy Connor testified that EMS was called to the scene, that the EMS workers questioned petitioner, and that petitioner was able to correctly identify the date and the name of the president. Deputy Connor also testified that petitioner said she had to go back and finish what she started. Deputy Connor arrested petitioner and, while he was transporting her to the hospital, she said, "You have to go back and let me get my heads."

Aaron Aliff, a registered nurse at Princeton Community Hospital, testified that on April 1, 2018, he attempted to obtain medical information from petitioner. Mr. Aliff stated that, as he was leaving petitioner's room, petitioner said "[Y]our head will be in my lap someday." "I promise your head will be in my lap one day."

Dr. Allen Mock, who was recognized as an expert in forensic pathology, testified regarding his autopsy of the victim. Dr. Mock found that the victim had two stab wounds to the neck, thirteen stab wounds to the chest, two stab wounds to the abdomen, one stab wound in the back, and blunt force trauma to the head. Dr. Mock concluded that some of the individual stab wounds alone would have been fatal. Further, Dr. Mock opined that the victim died before he was decapitated.

Joe Flemming testified that petitioner cleaned his home once every two weeks. Flemming further testified that on March 31, 2018, petitioner asked him for some gasoline and a chain saw, claiming that she was going to have a bonfire. Mr. Flemming said that when petitioner came to his home to collect those items, she was agitated, had a cut on her hand, and said "you know what you

2

had to do [in the military] and now I have to do what I have to do." Mr. Flemming testified that he did not give petitioner the chain saw because he did not lend out his tools, but he did give her ten gallons of gasoline. Finally, Mr. Flemming said he received several calls from petitioner on the evening of March 31, 2018, and at 4:00 a.m. on April 1, 2018, when petitioner asked him to come and get her.

Jimmy White, the victim's father, testified that he was a drug addict and that he and petitioner had the same lifestyle. Mr. White further testified that on March 30 and 31, 2018, he, petitioner, the victim, and another woman were together trying to obtain drugs. Mr. White said that on the evening of March 31, 2018, petitioner and the victim left his house and went to the victim's house. Mr. White claimed that the victim did not use drugs but that the victim sold drugs to him and others. Mr. White testified that he called the victim early on April 1, 2018, and, when the victim did not answer the phone, he went to the victim's home, saw petitioner's van in the driveway, and then found the victim's decapitated body inside the house. Mr. White said he did not call the police to report the victim's death because he was "dope sick" and he did not have his phone on him.

Rebecca Bailey, an acquaintance of petitioner, testified that petitioner both called and texted her between 12:00 a.m. and 1:00 a.m. on April 1, 2018, and asked to speak to Ms. Bailey's boyfriend. Ms. Bailey said petitioner told her that the matter she needed to speak to the boyfriend about was "end of the world bad" and "urgent." Petitioner offered to come and get Ms. Bailey and her boyfriend and said she would give them money if they would go with her. Ms. Bailey testified that petitioner seemed to be in her right mind, but that she was agitated. Ms. Bailey also said petitioner texted her again around 3:30 a.m. and made the same request. Ms. Bailey stated that when she asked petitioner what was going on, petitioner replied "nothing" and that she just wanted to get out of town.

Mandy White testified that she gave petitioner methamphetamine the day before the victim's body was discovered.

Detective Logan Addair testified that, at the victim's house, he found the victim's headless body and a bloody glove which was later found to match the bloody glove petitioner was wearing when she was discovered on Mr. Shepherd's property. Detective Addair also testified that he found a bloody knife in petitioner's car, and a bloody wrench and five bent and bloody kitchen knives inside the victim's house. Using the victim's phone, Detective Addair created a timeline of texts between petitioner and the victim, and the victim and his father. The texts were sent between 7:45 p.m. on March 31, 2018, and 6:58 a.m. on April 1, 2018.

Zachary Pedrim, a corrections officer at the Southern Regional Jail, testified that on April 1, 2018, petitioner told him that she "already had one body, and they weren't nothing."

The State, in its closing argument, discussed petitioner's possible intoxication and mental health issues stating that:

The fact is anybody who is involved in the deliberate, intentional, premeditated taking of a human life is acting beyond the vale, anybody is. We don't let them

3

walk away because they tattoo on their chest SPECIAL KIND OF CRAZY. We don't let them go because they proudly proclaim, I've already got one body, you all ain't nothing. We don't let them walk around society because they act crazy. Like mental illness is the cause of it all, like that's to blame and it deprives them of agency of their own actions. That's not what we do as a society.

The State also discussed the testimony of the other witnesses and that it appeared petitioner was possibly trading sexual favors with the victim in exchange for pills or money. The State then reviewed petitioner's history of drug use saying,

> I don't know the combination of chemicals [petitioner] chose to inject into her bloodstream, but she chose it. There's no evidence that anybody compelled her to ingest any intoxicating substance or that anybody tricked her into something that she wasn't accustomed to doing. And this was not something she was caught by surprise with. Jimmy [the victim's father] told you that *they've* been doing methamphetamine since the 90's.

(Emphasis added.) The State next addressed the medical evidence including the cause of the victim's death, and petitioner's actions and comments on March 31, and April 1, 2018. The State asked the jury, "Now, [are petitioner's actions] "deserving of mercy? Is this chain of events something beyond her control? *'Blessed are the merciful for they shall receive mercy,' Matthew 5:7.*" (Emphasis added.)

Following the defense's closing, the State gave a rebuttal. The State first noted that the knife found in petitioner's car had the victim's blood on it. Next, the State highlighted that most of the people involved in the case were drug addicts:

> But these people are drug addicts. All of them are drug addicts except [the victim]. They're cold, they'll pimp out their girlfriends for drugs and not feel a thing about it because they both got drugs. You send your girlfriend to sleep with somebody, even your son, and they come back, I mean, they're cold. Their priorities aren't right. They're drug addicts. And [petitioner] behaves like a drug addict[.]

(Emphasis added.) The following exchange then occurred:

> *Prosecutor Stitler*: But petitioner, petitioner has been proud of this ever since it happened.

> *Petitioner's Counsel*: I object to that. That's – that's way outside the evidence. She's proud of it.

> *The State*: SPECIAL KIND OF CRAZY was tattooed on [petitioner's] chest.

> *The Court*: Mr. Stitler [the prosecutor].

> *Prosecutor Stitler*: Yes, Your Honor, sorry.

*The Court*: Mr. Stitler, that's sustained.

The State then continued, stating:

> The evidence shows that the defendant has made decisions like, I'm not even sorry. Declarations like, you want to keep your head. Declarations like, I've already got one body. You all ain't nothing. Those declarations are not evidence that someone is an innocent victim of circumstance. Those declarations are not indications that someone has had things done to her or situations that are put upon her that are beyond her control, beyond her ability to make decisions about. Those declarations are declarations of an unrepentant murderer. And I ask that you find accordingly.

On December 5, 2019, the jury found petitioner guilty of one count of first-degree murder without a recommendation of mercy.

On January 2, 2020, petitioner filed a motion to set aside the verdict and for a new trial. Petitioner argued that she was denied a fair trial due to the State's misleading and prejudicial remarks during closing which she claimed were not supported by the testimony at trial. Finally, petitioner claimed there was insufficient evidence at trial to sustain a conviction.

At a January 6, 2020, hearing on petitioner' post-trial motions to set aside the verdict and for a new trial, petitioner argued that the State, during closing and rebuttal, made misleading and prejudicial remarks regarding her character and facts not in evidence such as the tattoo on her chest. Regarding petitioner's tattoo, the State said that it was visible to the jury at trial and that petitioner "chose to come to trial clad in attire that proudly showed the tattoo." Petitioner's counsel responded, "I don't know that the jurors could read the tattoo on her chest" and then argued that the jury did not know about the tattoo until the State mentioned it in closing. By order entered January 23, 2020, the circuit court denied petitioner's post-trial motions.

At petitioner's January 27, 2020, sentencing hearing, she renewed her motion for a new trial. No evidence was adduced. The circuit court, per the jury's verdict , sentenced petitioner to life without the possibility of parole. The court entered petitioner's sentencing order on January 28, 2020.

Petitioner now appeals. Petitioner argues that the State violated her fundamental right to a fair trial during closing arguments by mischaracterizing her statements and other testimony, by remarking on facts not in evidence, and by quoting the Bible to inflame the passion of the jury. Specifically, petitioner argues that six of the State's comments in closing and rebuttal rise to the level of prosecutorial misconduct and that she was prejudiced by these comments. First, petitioner highlights that the State opined on rebuttal that the petitioner's comments on the morning of her arrest were "the declarations of an unrepentant murderer." Second and third, petitioner highlights that the State commented in closing and on rebuttal that petitioner's chest tattoo reads "SPECIAL KIND OF CRAZY." Petitioner highlights that the tattoo was not mentioned pretrial or during either parties' case-in-chief, and that petitioner did not testify at trial. Fourth, petitioner argues that, on rebuttal, the State theorized, without substantiation, that the victim's father, Jimmy White,

would "pimp out" petitioner to the victim in exchange for drugs because Mr. White and petitioner were "cold" drug addicts whose "minds aren't right." Fifth, petitioner contends that the State mischaracterized Jimmy White's testimony by implying in closing that he said that both he *and* petitioner had used methamphetamine since the 1990's. Instead, White testified only that *he* used methamphetamine since the 1990's. Sixth and lastly, the State, in closing, cited a Bible verse from Matthew 5:7: "Blessed are the merciful for they shall receive mercy." Petitioner contends the State used this verse to ask the jury to show petitioner the same level of mercy she showed to the victim.

Petitioner admits that her trial counsel did not object to these six remarks. However, she alleges that they rise to the level of plain error. *See* W. Va. R. Crim. Proc. 52(b). "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

We review a claim of prosecutorial misconduct under the following standard:

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Syl. Pt. 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995). "[T]he long and well-established rule [is] that prosecutors are entitled to great latitude in closing arguments and it is only where improper remarks are clearly prejudicial or result in manifest injustice that reversal is proper. Syl. pt. 2, *State v. Brewster*, W.Va., 261 S.E.2d 77 (1979), quoting in part, Syl. pt. 1, *State v. Dunn*, W.Va., 246 S.E.2d 245 (1978)[.]" *State v. Critzer*, 167 W. Va. 655, 658-59, 280 S.E.2d 288, 291 (1981).

The first statement of which petitioner complains is the State's use of the phrase "unrepentant murderer." Specifically, the State said,

> The evidence shows that the defendant has made declarations like, I'm not even sorry. Declarations like, you want to keep your head. Declarations like, I've already got one body. You all ain't nothing. Those declarations are not evidence that someone is an innocent victim of circumstance. Those declarations are not indications that someone has had things done to her or situations put upon her that are beyond her control, beyond her ability to make decisions about. Those declarations are declarations of an *unrepentant murderer*. I ask that you find accordingly.

(Emphasis added.) In this one isolated instance on rebuttal, the State characterized petitioner's *actions* as those of an "unrepentant murderer." There is no evidence showing, and petitioner does not argue, that the statement was deliberately placed before the jury to mislead the jury or to divert

the jury's attention to an improper matter. Moreover, the evidence of petitioner's culpability for the murder was overwhelmingly sufficient to support her conviction. This Court has found that certain phrases used by the State in closing mandate a finding of reversible error. For example, in *State v. Moss*, the State, in closing, called a criminal defendant a "psychopath" with a "diseased criminal mind" and said that the defendant should not be released "to slaughter women and children." 180 W. Va. 363, 368, 376 S.E.2d 569, 574 (1988) (internal quotation and citation omitted). Here, we find that the State's choice of language to describe petitioner's actions does not rise to the level of reversible error.

Next, petitioner contends that the State's comments regarding petitioner's tattoo, and its claim that drug addicts such as Jimmy White "pimp out their girlfriends for drugs," violate the prohibition against introducing facts outside the record in closing and rebuttal. "Clearly, a prosecuting attorney should refrain from referring to questionable evidence that may poison the jury's mind against the defendant. However, there is equally clear authority that a prosecuting attorney's suggestion of a plausible inference to be drawn from the evidence is proper." *Sugg*, 193 W. Va. at 405, 456 S.E.2d at 486. In closing, the State highlighted that most of the people involved in this case are drug addicts and/or sell drugs and behave as such. Moreover, the State said "drug addicts" pimp out their girlfriends; it did not state that Jimmy White pimped out petitioner. The State can speak on a general idea, such as a pervasive drug culture and all its attendant woes, without the comment unfairly maligning the defendant. *See State v. Dunn*, 162 W. Va. 63, 67, 246 S.E.2d 245, 249 (1978) (finding that a comment regarding the local drug culture did not rise to the level of reversible error, and stating that "[c]ontrary to defendant's assertions, this is not a case like *Peck v. Bez*, 129 W. Va. 247, 40 S.E.2d 1 (1946) where a personal attack was deliberately directed against a party's character in order to prejudice the jury.").

As for petitioner's "SPECIAL KIND OF CRAZY" tattoo, the State mentioned it twice. Although both mentions are regrettable, we find that neither rises to the level of plain error. There is no evidence that mentioning the tattoo misled the jury. Moreover, even if the jury assumed that petitioner, through the tattoo, was acknowledging that she was a "SPECIAL KIND OF CRAZY," that does not equate to proof that she murdered the victim. Further, there is no evidence that the State mentioned the tattoo to the jury as a means of diverting their attention to extraneous matters. Finally, and as noted above, the evidence of petitioner's guilt was overwhelming.

Petitioner next argues that the State mischaracterized the evidence when it said that both Jimmy White and petitioner had used methamphetamine since the 1990s. It is true that Mr. White did not specifically state that he and petitioner had used methamphetamine since the 1990's. However, Jimmy White testified that he met petitioner in the 1990s and that his relationship with petitioner always involved drug use. Further, Mandy White testified that she gave petitioner methamphetamine on the day before the murder. In this regard, the circuit court noted in the order on appeal that,

> several witnesses testified that petitioner had a drug problem. In fact, the reason the Defendant and the victim were together that day was for the purpose of obtaining drugs. Thus, the remark made regarding the defendant being a drug addict did not have a tendency to mislead the jury, and even though it was prejudicial to the

accused, the jury heard this fact from several witnesses during trial without objections.

"A prosecutor is allowed to argue all reasonable inferences from the facts. In the present case, the prosecution's comments on the witnesses' testimony were based on reasonable inferences from the facts and did not include any interjection of the prosecutor's personal opinion as to the truthfulness of the witnesses." *State v. Asbury*, 187 W. Va. 87, 92, 415 S.E.2d 891, 896 (1992). Because the State's comments were supported by the record, we find no plain error.

Regarding the Bible quotation, we said in a similar case that,

> The defense failed to object at trial to the State's reference to the Bible. Only after the jury notified the court that a verdict had been reached, did defense counsel move for a mistrial. ""Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal." Syllabus Point 1, *State Road Commission v. Ferguson*, 148 W.Va. 742, 137 S.E.2d 206 (1964).' Syllabus point 3, *O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 404 S.E.2d 420 (1991)." Syl. pt. 10, *State v. Satterfield*, 193 W.Va. 503, 457 S.E.2d 440 (1995).

*State v. Bradford*, 199 W. Va. 338, 348-49, 484 S.E.2d 221, 231-32 (1997). In *State v. McCracken*, 218 W. Va. 190, 624 S.E.2d 537 (2005), the State twice referenced a prayer at trial even after an earlier reference to the prayer elicited a sustained objection. *Id.* at 196, 624 S.E.2d 543. This Court denied Mr. McCracken's appeal, which assigned error to the State's reference to the prayer. Specifically, we found that

> not all improper prosecutorial statements will lead to reversal of a defendant's conviction. This Court concludes that within the particular circumstances of the present case, no clear prejudice or manifest injustice resulted from the prosecutor's remarks. An examination of the factors identified in *Sugg* reveals that the conviction in the case should not be reversed. The remarks were of limited duration and were somewhat isolated within the context of the prosecutor's attempt to summarize the evidence against the Appellant. Most importantly, syllabus point five of *Sugg*, quoted above, instructs that remarks "which do not clearly prejudice the accused or result in manifest injustice" will not trigger reversal of a conviction. 193 W.Va. at 393, 456 S.E.2d at 474. Examining all evidence presented in this case, we find no manifest injustice or clear prejudice. While the prosecutor's statements regarding the child's prayer were improper, they do not justify a reversal of the Appellant's conviction in these circumstances.

*McCracken*, 218 W. Va. at 196, 624 S.E.2d at 543. In the instant case, there is no evidence that the State's brief Bible quotation resulted in manifest injustice or clear prejudice particularly where, in the presence of the jury, the circuit court chastened the State for making the comment and, in response, the State apologized to the court for the statement. Accordingly we find no prejudice and, therefore, find no error.

Here, the six comments of which petitioner complains were made in isolation during an extensive closing argument and rebuttal, petitioner had an opportunity to respond to many of the comments during his closing, none of the State's comments deflected the jury's attention to irrelevant or improper matter, and, as noted above, the evidence was more than sufficient to sustain petitioner's conviction. Therefore, petitioner cannot show that those six comments amount to plain error requiring the reversal of her conviction, particularly in light of the overwhelming evidence of petitioner's guilt.

Accordingly, for the foregoing reasons, we affirm the circuit court's January 23, 2020, order denying petitioner's motion for a new trial, and the January 28, 2020, order sentencing petitioner to life in prison without the possibility of parole.

Affirmed.

**ISSUED:** July 19, 2021

**CONCURRED IN BY:**

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton