457 S.E.2d 440

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Shawn SATTERFIELD, Defendant Below, Appellant.**

No. 22374.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 11, 1995.

Decided March 27, 1995.

Dissenting Opinion by Chief Justice Neely April 13, 1995.

Carl P. Bryant, Bryant & White, St. Marys, for appellant.

Darrell V. McGraw, Jr., Atty. Gen., Jacqueline I. Custer, Sr. Asst. Atty. Gen., Charleston, for appellee.

ment with eligibility for parole after a jury found him guilty of first degree murder with a recommendation of mercy. For reasons set forth below, we affirm the order of the circuit court.

I.

The appellant and his half-brother, Brian Vincent, were charged with murdering Billy Harper, a retired public school bus driver, during the late night hours of January 22, 1993. The facts surrounding the murder are contradictory and unclear.

The strongest evidence against the appellant was provided by Glen Thomas and Bucky Moore, who were initially questioned by the police after witnesses stated that they saw Glen Thomas' car in the vicinity of the victim's home on the night of the murder. Thomas and Moore agreed to tell the police everything they knew about the murder if they would be granted immunity from prosecution for their involvement in the crime. Eventually, the trial court did grant immunity to Moore and Thomas for their testimony at trial.

At trial, Moore and Thomas testified that they gave the appellant and Brian Vincent a ride to the vicinity of the victim's home. The appellant or Brian Vincent indicated that they were planning to rob the victim and anticipated having to hit the victim on the head during the robbery. When the appellant and Brian Vincent got out of the car, they had an ax handle with them. The ax handle had originally belonged to Thomas, but Thomas alleged that the ax handle was removed from his car by Brian Vincent prior to the incident. Moore and Thomas maintained that they were to return to pick up the appellant and Brian Vincent later in the evening.

When Moore and Thomas returned to pick up the appellant and Brian Vincent, they were unable to locate them. Subsequently, Moore and Thomas alleged that when they saw the appellant and Brian Vincent, the two admitted that when robbing the victim, Brian Vincent had told the victim the appellant's name. Therefore, the appellant and Brian Vincent took turns striking the victim with the ax handle until he died. The appellant

McHUGH, Justice:

This case is before this Court upon the appeal of Shawn Satterfield from the October 7, 1993 order of the Circuit Court of Ritchie County which sentenced him to life imprison-

and Brian Vincent also allegedly told Moore and Thomas that they took the victim's billfold, which was never recovered, and a .22 rifle, which they hid behind a school bus stop in the vicinity. Evidently, the billfold was burned in the appellant's father's wood stove.

During a search of the area after the murder, the ax handle, which was wrapped in the victim's plaid flannel jacket, and the .22 rifle, were recovered. Forensic reports state that the hair on the ax handle was consistent with the victim's hair.

Moore's and Thomas' testimony further indicates that a couple of days after the murder the appellant and Brian Vincent stated that they needed a ride to Paul Greene's house, who is a friend of theirs, so that they could ask him to provide an alibi. The appellant and Brian Vincent were concerned with the disposal of their bloodied clothes.

Paul Greene testified that the appellant and Brian Vincent came to his home and requested that he provide an alibi. Though Mr. Greene refused to provide one, he did not ask for a reason for the request. However, Paul Greene did describe a black garbage bag that the appellant had brought with him. The black garbage bag allegedly contained the bloodied clothes of the appellant and Brian Vincent.

The appellant evidently took the bag with him when he and Brian Vincent left Mr. Greene's house and went to Don Vincent's house to stay the night. Don Vincent, who is co-defendant Brian Vincent's brother and appellant's half-brother, testified that he saw Brian Vincent retrieve the black garbage bag from a wood pile in his driveway. Brian Vincent and the appellant then disappeared into the woods with the black garbage bag and returned about thirty minutes later without it.

Several witnesses testified that they saw two people walking along the highway in the vicinity of the victim's house on the night of the murder. The witnesses provided different descriptions of the two people and different descriptions of what they were wearing.

At least one witness testified that one of the men had on a black leather coat and the other an army fatigue jacket. Thomas testified that he could have had on a black leather coat on the night of the murder. Moore admitted that he had on an army camouflage jacket on the night of the murder.

However, three witnesses specifically identified the appellant as being one of the men walking along the highway. One witness saw the appellant earlier in the evening in a store wearing a red and black flannel jacket, and later he thought he saw the appellant and another individual walking along the highway near the victim's home. Another witness stated that he saw two men walking along the highway in dark clothing, but he could not identify either until the appellant's picture appeared in a newspaper. The third witness stated that he saw the appellant and another individual walking along the highway.

Subsequent to the trial, at a hearing to set aside the verdict based upon newly-discovered evidence, a witness testified that she saw the appellant and Brian Vincent in the town of Pennsboro at the time the other witnesses state that they saw two men walking along a highway near the victim's house. Therefore, the appellant argues that witnesses could not have seen them walking along the highway near the victim's house.

Moreover, Moore testified that after he and Thomas could not find the appellant and Brian Vincent when they returned to pick them up on the night of the murder, he went to Del Vincent's house (Del Vincent is Brian Vincent's brother and appellant's half-brother) where he stayed the night.

Additionally, the only identifiable fingerprints at the crime scene were those of the victim. The expert testimony regarding the blood test results was contradictory. There was also testimony which indicates that all four men, the appellant, Brian Vincent, Thomas, and Moore, were smoking marihuana on the evening of the murder.

During the trial the appellant's attorney aggressively cross-examined Moore and even suggested that Moore may have committed the murder. In fact, the appellant's attorney implied that Moore had told people that he struck the first blow on the victim during the murder. After recross-examination, Moore

concluded his testimony, but was subject to recall by the State. Before the trial court reconvened the next day, Moore committed suicide. The appellant's attorney stated that he would not be calling witnesses to testify that Moore stated that he struck the first blow. However, subsequent to the suicide, Del Vincent testified that Moore did not come by his place on that night. Additionally, pursuant to the appellant's questioning, Del Vincent testified that Moore asked him to provide an alibi, and that on previous occasions Moore had bragged that he was going to kill people.

Because of the appellant's attack on the credibility of Moore after his death and because the appellant suggested that Moore had committed the murders, the trial judge permitted the State to introduce a suicide note left by Moore which stated: "I didn't kill Harper and I won't do time for something that I didn't do. I'm sorry but I just can't take the presure [sic] of going through a trial. Good-by [sic]. [Signed] Bucky Moore. Tell Teresa [Bucky Moore's girlfriend] I loved he [sic] more than any thing in the world." The jury convicted the appellant of first degree murder with a recommendation of mercy based on the above evidence.

## II.

The first issue before us is whether the trial judge erred by admitting into evidence the suicide note of Moore pursuant to the dying declaration exception to the hearsay rule found in the *West Virginia Rules of Evidence* 804(b)(2).

Even before the adoption of the rules of evidence, hearsay was generally not permitted in trials. *See* 29 Am.Jur.2d *Evidence* § 658 (1994). The rationale for this rule is that out of court statements

lack the conventional indicia of reliability: they are usually not made under oath or under circumstances that impress the declarant with the solemnity of his or her statements; the declarant's word is not subject to cross-examination; and the declarant is not available so that his or her demeanor and credibility may be assessed by the jury.

*Id.* (footnote omitted). Nevertheless, several exceptions to the hearsay rule have been recognized.

One of the exceptions is known as the dying declaration:

The exception for dying declarations—which antedates the development of the hearsay rule and the adoption of the Constitution was originally held to rest on the religious belief 'that the dying declarant, knowing that he is about to die would be unwilling to go to his maker with a lie on his lips.'

4 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* 804(b)(2)[01] at 804–124 to 804–125 (1994) (footnotes omitted and quote from Quick, *Some Reflections on Dying Declarations,* 6 Howard L.J. 109, 111 (1960)). Although in modern times the rationale for the dying declaration exception to the hearsay rule is not necessarily religious, scholars continue to recognize the trustworthiness of a statement of a dying person since a dying person will not personally benefit from lying. *See* 29A Am.Jur.2d *Evidence* § 829 (1994) ("The dying declaration exception to the general rule prohibiting the admission of hearsay statements at trial is based on the belief that persons making dying declarations are highly unlikely to lie." (footnote omitted)). *See also* 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8–4(B)(2) at 274 (3d 1994) ("The principle upon which the dying declaration is admitted ... is that it has been made after the declarant ... has presently approached so near upon the verge of death that he can see ... no possible expectation, by anything he may do or say, of any personal benefit or advantage to himself in any of the material affairs of the outside world[.]") *But see* 4 Weinstein, *supra* at ¶ 804(b)(2)[01] at 804–125 ("[T]he lack of inherent reliability of deathbed statements has often been pointed out: experience indicates that the desire for revenge or self-exoneration or to protect one's loved ones may continue until the moment of death.")

At common law the dying declaration exception only applied when the declarant was the murder victim. 2 Cleckley, *supra. See State v. Meek,* 107 W.Va. 324, 148 S.E. 208

(1929). However, the adoption of the rules of evidence has broadened the common law:

(b) *Hearsay Exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(2) Statement under Belief of Impending Death.—In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his or her death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.

*W.Va.R.Evid.* 804(b)(2). The rules of evidence have obviously extended the dying declaration exception to civil cases and do not state that the declarant must be a murder victim.

■ Under the rules of evidence, the focus is not on who made the statement when determining whether the dying declaration is admissible. Instead, courts focus on the circumstances giving rise to the dying declaration:

What is required for a dying declaration to be admissible is that the declarant have such a belief that he is facing death as to remove ordinary worldly motives for mis-

statement. In that regard, the court may consider the totality of the circumstances of motive to falsify and the manner in which the statement was volunteered or elicited.

Syl. pt. 3, *State v. Young,* 166 W.Va. 309, 273 S.E.2d 592 (1980), *holding modified on a different ground by State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991).

In the case before us, the dying declaration was in the form of a suicide note. Few courts have addressed whether a suicide note would ever fall into the dying declaration exception to the hearsay rule.[1] Common sense dictates, however, that just as the rules of evidence have broadened the common law to include declarants who are not murder victims, the rules of evidence would also contemplate situations in which a dying declaration could be contained in a suicide note.

■ Accordingly, we hold that a suicide note may be admissible pursuant to *W.Va. R.Evid.* 804(b)(2) as a dying declaration exception to the hearsay rule. In order for a statement found in a suicide note to be admissible as a dying declaration the following must occur: the statement must have been made when the declarant was under the belief that his death was imminent, and the

---

1. At least one court, in dicta, has stated that the suicide note in the case before it would not be admissible as a dying declaration. *United States v. Lemonakis,* 485 F.2d 941 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974), and *cert. denied by Enten v. U.S.,* 415 U.S. 989, 94 S.Ct. 1587, 39 L.Ed.2d 885. In *Lemonakis,* an informer, who was granted immunity to testify against the appellant, committed suicide before the trial against the appellant began. In a suicide note left to the informer's girlfriend the informer stated that the appellant did not commit the robberies. The appellant moved to admit the suicide note as exculpatory evidence; however, the trial court excluded it as hearsay.

The United States Court of Appeals, District of Columbia Circuit stated that fairness required that the suicide note be admitted into evidence in spite of the hearsay rule. The rationale was that since inculpatory recordings between the informer and appellant had been admitted at trial, fairness demanded that the exculpatory suicide note be admitted. However, the United States Court of Appeals, District of Columbia Circuit ultimately held that the exclusion of the suicide note by the trial court below was harmless error.

*Id.* at 956–58. In a footnote the United States Court of Appeals stated that since the note was not made with the belief that death was imminent (the note was written almost a week before the informant committed suicide) and since the note did not contain information about the causes or circumstances of its maker's death, the suicide note would not fall into the dying declaration exception to the hearsay rule. *Id.* at 956 n.. 24.

There are at least two other cases which address whether a suicide note is admissible into evidence as a dying declaration: *State v. Hodge,* 655 S.W.2d 738 (Mo.Ct.App.1983) and *Commonwealth v. Antonini,* 165 Pa.Super. 501, 69 A.2d 436 (1949). However, in both cases the courts found that the suicide note was not admissible since the declarant was not the victim of a homicide (neither Missouri nor Pennsylvania has codified or adopted rules of evidence which are similar to the *West Virginia Rules of Evidence* or the *Federal Rules of Evidence* ). *See Hodge,* 655 S.W.2d at 742 and *Antonini,* 69 A.2d at 438. These cases are not helpful to the issue before us since, as we have previously pointed out, West Virginia has adopted *W.Va.R.Evid.* 804(b)(2), which has broadened the common law to include declarants who are not murder victims.

dying declaration must concern the cause or circumstances of what the declarant believes to be his impending death.

However, even if a trial judge finds that a suicide note is a dying declaration, that does not necessarily mean that the suicide note is admissible. The trial judge must additionally analyze whether the suicide note is relevant pursuant to *W.Va.R.Evid.* 401 and, if so, thereby admissible pursuant to *W.Va.R.Evid.* 402. However, if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice," then, although relevant, the evidence may be excluded pursuant to *W.Va.R.Evid.* 403.[2] *See generally* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4–3 at 224 (3d 1994) (Evidence may generally be excluded under *W.Va.R.Evid.* 403 even though it otherwise qualifies for admission under the rules of evidence.)[3]

Applying a 403 analysis to the hearsay exception is not a new concept. In Weinstein's text the following discussion regarding the admissibility of a dying declaration appears:

> The true test of admissibility is whether admission of the [dying declaration] statement will help the jury in its task, i.e., whether it is sufficiently reliable and relevant to withstand exclusion because its probative value is substantially outweighed by the danger of prejudice to the party against whom it is offered.

4 Weinstein, *supra* at ¶ 804(b)(2)[01] at 804–131. Moreover, our prior cases support the notion that *W.Va.R.Evid.* 403 applies to hearsay situations. *See State v. Murray*, 180 W.Va. 41, 45, 375 S.E.2d 405, 409 (1988) and *State v. Golden*, 175 W.Va. 551, 554–55, 336 S.E.2d 198, 201 (1985).

We caution a trial judge to be mindful that evidence may not be excluded under *W.Va.R.Evid.* 403 merely because he or she does not find the evidence to be credible, although the trial judge may consider the probative value of the evidence when undertaking the required balancing test pursuant to *W.Va.R.Evid.* 403. *See U.S. v. Thompson*, 615 F.2d 329, 332–33 (5th Cir. 1980). After all, it is fundamental that credibility determinations are for the jury.[4] *Id.* at 332.

Thus, we hold that once a trial judge determines that a statement falls within the dying declaration exception to the hearsay rule found in *W.Va.R.Evid.* 804(b)(2), then it must be determined whether the evidence is relevant pursuant to *W.Va.R.Evid.* 401 and 402 and, if so, whether its probative value is substantially outweighed by unfair prejudice pursuant to *W.Va.R.Evid.* 403. The statement is admissible only after the trial judge determines that its probative value is not substantially outweighed by unfair prejudice.

Applying the analysis we set forth above to this case poses two questions: (1) is Moore's suicide note a dying declaration and (2) if so,

2. *W.Va.R.Evid.* 401 states: "**Rule 401. Definition of 'Relevant Evidence'.** 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

*W.Va.R.Evid.* 402 states: "**Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of the State of West Virginia, by these rules, or by other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible."

*W.Va.R.Evid.* 403 states: "**Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the dan-

ger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

3. It has been stated that *W.Va.R.Evid.* 609, which concerns the admissibility of convictions for impeachment purposes, may be an exception to the *W.Va.R.Evid.* 403 analysis. *See* 1 Cleckley, *supra* § 4–3 at 224. However, since this issue is not before us, we decline to further address it.

4. We point out that the analysis has changed somewhat since syllabus point 3 of *Young, supra* was written due to the adoption of the rules of evidence (our discussion of *Young* is found on page 448 of this opinion). Therefore, we clarify that the jury and not the trial judge determines whether there is a motive to falsify since that issue goes to whether the dying declaration is credible.

is it relevant and is its probative value substantially outweighed by unfair prejudice pursuant to *W.Va.R.Evid.* 401, 402 and 403.

■ Is Moore's suicide note a dying declaration? Clearly, there was evidence that Moore wrote the suicide note with the belief that he was facing imminent death because he killed himself soon after writing the note. Additionally, the suicide note explained why Moore killed himself thereby explaining the causes or circumstances which led to his death. Therefore, Moore's suicide note falls within the dying declaration exception to the hearsay rule.

■ Is Moore's suicide note relevant and, if so, is its probative value substantially outweighed by unfair prejudice to the appellant? Though the trial judge in the case before us did not use this analysis, our review of the record reveals that Moore's suicide note is relevant and its probative value is not substantially outweighed by any unfair prejudice.

In summary, we hold that Moore's suicide note falls within the dying declaration exception to the hearsay rule. We further conclude that the application of *W.Va.R.Evid.* 401, 402, and 403 to the facts in this case demonstrates that the probative value of the suicide note is not substantially outweighed by any unfair prejudice. Therefore, it was not error for the trial judge to admit Moore's suicide note into evidence.

### III.

The following three issues raised by the appellant will be addressed together since they are all related: (1) was the indictment charging the appellant with murder defective since it did not specifically state that the appellant was being charged with the offense of felony murder as well as first degree murder; (2) was it error for the trial judge to read instructions regarding felony murder; and (3) was it error for the trial judge to rule that involuntary manslaughter was not a lesser included offense of murder. For reasons explained below, we find that the above issues are without merit.

■ According to the appellant, the indictment charged him with "feloniously, mali-

ciously, deliberately and unlawfully ... slay[ing], kill[ing], and murder[ing] one Billy Harper[.]" The appellant argues that since the indictment did not reflect that the murder occurred during a robbery, it was error for the trial judge to read instructions regarding felony murder. However, this argument has been rejected previously by this Court in a case in which the defendant was convicted under the theory of felony murder:

'An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under *W.Va.Code,* 61–2–1, to set forth the manner or means by which the death of the deceased was caused.' Syllabus Point 5, *State v. Bragg,* 160 W.Va. 455, 235 S.E.2d 466 (1977).

Syl. pt. 10, *State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (1983). Thus, it is clear that the indictment did not need to specifically charge the appellant with felony murder. Additionally, it follows that it was not error for the trial judge to read instructions regarding felony murder.

■ As for the appellant's last contention that it was error for the trial judge to rule that involuntary manslaughter was not a lesser included offense of murder, the State maintains that the trial judge properly found that the evidence at the trial did not support an instruction to the jury on involuntary manslaughter. This Court held in syllabus point 1 of *State v. White,* 171 W.Va. 658, 301 S.E.2d 615 (1983) that " '[a]n instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it.' Syllabus Point 8, *State v. Hall,* 171 W.Va. 212, 298 S.E.2d 246 (1982)." Our review of the record reveals that the State is correct: the evidence at the trial did not support an instruction to the jury on involuntary manslaughter.

### IV.

■ The next issue raised by the appellant is whether the trial judge erred by

refusing to grant the appellant's motion for a change in venue. Syllabus points 1, 2 and 3 of *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994) are helpful to the resolution of this issue:

1. ' "To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." Point 2, Syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).' Syllabus Point 1, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978).

2. ' "A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county." Point 2, Syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967) *quoting* Point 1, Syllabus, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927).' Syllabus Point 2, *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978).

3. One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

In the case before us, the trial judge conducted a thorough individual *voir dire* of each prospective juror over the course of four days. Our review of the record indicates that most of the prospective jurors had heard about the case through the television, newspaper, or word of mouth, although few of the jurors could remember any specific details. However, each prospective juror was specifically asked whether his or her knowledge of the case would influence his or her decision at trial, and those prospective jurors who indicated that they could not be impartial were dismissed for cause.

Because of the extensive *voir dire* conducted by the trial judge and because any juror who stated that he or she could not be impartial was removed, we do not find that a change of venue was necessary. Therefore, the trial judge did not abuse his discretion by refusing to grant the change of venue.

## V.

■ The next issue raised by the appellant is that the trial judge erred in refusing to grant the appellant's challenge for cause of L.R. Northcraft, a prospective juror who was a good friend of four key State witnesses, a friend of the victim and the victim's daughter, and who knew some of the facts of the case from the two people who discovered the body of the victim.[5] The State points out that Northcraft also stated that he knew the appellant's family. The trial judge repeatedly questioned Northcraft about whether he could be impartial, and Northcraft repeatedly assured the trial judge that he could be.

■ This Court held in syllabus point 7 of *State v. Neider*, 170 W.Va. 662, 295 S.E.2d 902 (1982) that " ' "[t]he true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court." Syllabus Point 1, *State v. Kilpatrick*, 158 W.Va. 289, 210 S.E.2d 480 (1974).' Syllabus Point 3, *State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234 (1981)." Our review of the record indicates that Northcraft was qualified to serve on the panel. Thus, we do not find that the trial judge erred in his ruling regarding prospective juror Northcraft.

## VI.

■ The appellant's next assignment of error involves whether or not the trial judge erred in giving instructions regarding accomplices and robbery. We are mindful that "[i]n reviewing the adequacy of a trial court's choice and selection of jury instructions, we accord the trial court much discretion and

---

5. Although a prospective juror, Northcraft was not selected as a juror for appellant's trial.

will not reverse provided that the instructions, taken as whole, adequately state the controlling law." *Derr,* 192 W.Va. at 179, 451 S.E.2d at 745.

### A.

■ More specifically, the appellant asserts that the trial court erred in granting an instruction on accomplices and accomplice testimony when there was no testimony by an accomplice at trial. The basis of the appellant's argument is that since neither he nor Brian Vincent testified at trial and since no one else was charged with the crime, there was no testimony by an accomplice.

■ An accomplice is defined as "[o]ne who is in some way concerned or associated in commission of crime; partaker of guilt; one who aids or assists, or is an accessory." *Black's Law Dictionary* 17 (6th ed. 1990) (citation omitted). The State correctly points out that although neither the appellant nor Brian Vincent testified, Thomas and Moore testified and both could be considered accomplices since they knowingly drove the appellant and Brian Vincent to the scene of the crime.[6] Therefore, Thomas and Moore assisted the appellant with the crime.

■ Additionally, the State contends that the appellant tendered an instruction on accomplice testimony similar to that offered by the State which the trial judge refused. Therefore, the appellant cannot complain about an instruction which was granted on the same issue. We agree with the State's contentions and conclude that the trial judge did not abuse his discretion.

**6.** The trial judge gave the following instruction regarding accomplice testimony:

The Court further instructs the jury that an accomplice is a person who knowingly and with criminal intent participates directly or indirectly with another person in the commission of a crime. The testimony of an accomplice is admissible in evidence yet in considering such testimony as to matters connecting the defendant with the commission of the crime which are not supported by other evidence and circumstances you should examine such testimony with great care and caution in determining what weight you give thereto. You may, however, find the defendant guilty on the evidence of an accomplice standing alone

### B.

■ The appellant argues that the trial judge erred in granting an instruction defining the elements of robbery without specifically stating that the stolen goods were "of value" as set forth in *W.Va.Code,* 61–2–12 [1961]. We disagree.

The words "of value" do not appear in the text of the portion of the robbery statute which is applicable to the facts in the case before us. Instead, the words "of value" only appear in the portion of the robbery statute which concerns bank robberies. *See W.Va.Code,* 61–2–12 [1961].

Moreover, although not directly on point, this Court held the following in syllabus point 2 of *State v. Alvis,* 116 W.Va. 326, 180 S.E. 257 (1935): "It must appear from an indictment for robbery that the article taken had value, *but value need not be specifically averred.*" (emphasis added). This Court explained that " '[a]s force or fear is the main ingredient of [robbery], the indictment need not specify value.' [citations omitted] We know as men that some value attaches to a rifle, watch and flashlight. The amount of that value is not material." *Id.,* 116 W.Va. at 327, 180 S.E. at 257–58 (1935) (citations omitted).

■ This rationale is equally applicable to jury instructions regarding robbery. The trial judge, in the case before us, adequately instructed the jury since he specifically stated in the jury instructions that the jury must find that the State proved that a wallet or a .22 rifle was taken with force in order to find that robbery had occurred.[7] Therefore, we

and not supported by any other evidence if you are convinced by such evidence of the defendant's guilt beyond all reasonable doubt.

**7.** The trial judge gave the following instruction on robbery:

To prove the commission of or attempt to commit robbery the state of West Virginia must prove each of the following elements beyond a reasonable doubt: 1.) that the defendant, Shawn Satterfield, in Ritchie County, West Virginia, on or about the 23rd day of January, 1993, attempted to unlawfully or unlawfully took and carried away or attempted to take and carry away a wallet or .22 rifle from the person of Bill Harper or in his presence

find the appellant's contentions to be without merit.[8]

## VII.

■ The appellant argues that the State made several unfair statements during its closing argument. First, the appellant complains that the State made unprofessional statements regarding the appellant's trial counsel during the closing argument. Evidently, the appellant's trial counsel had remarked that the State kept information from the appellant, although it is not clear from the record when such remark was made. The State during closing arguments made the following statement about the remarks of the appellant's trial counsel: the appellant's trial counsel's remarks are "nothing but a low down lie." The appellant contends that this statement was prejudicial. The State, on the other hand, points out that the appellant failed to object to its comment; therefore, the appellant failed to preserve this error.

■ We agree: " 'Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal.' Syllabus Point 1, *State Road Commission v. Ferguson*, 148 W.Va. 742, 137 S.E.2d 206 (1964)." Syllabus point 3, *O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 404 S.E.2d 420 (1991). Accordingly, we decline to further address this issue.

Second, the appellant complains that the trial judge erred in permitting the State in closing argument to add the following additional information which was not in evidence:

> against his will by use of force or violence to Bill Harper or by the threat or presenting of a deadly weapon or instrumentality or by putting him in fear of bodily injury and with the intent to permanently deprive Bill Harper of his property.
> Robbery is the unlawful taking or carrying away of money or goods from the person of another or in his presence against his will by force or violence to his person or by the threat or presenting of a deadly weapon or instrumentality or by putting him in fear of bodily injury with the intent to deprive him permanently of the property. In order to constitute the crime of attempted robbery two require-

that glass was recovered from the victim's pants and that Brian Vincent was employed at a glass factory at one time, thereby implying that Brian Vincent was at the scene of the crime. The State correctly points out that the information the appellant complains about was in evidence. There was testimony at trial from Dr. Livingstone, the assistant medical examiner, that glass was found on the victim. Also, there was testimony that Brian Vincent was working in a glass factory at the time of the murder. Therefore, since this information was in evidence, it was not error for the State to bring this information up during closing argument. Moreover, the appellant failed to object to the State's discussion of this evidence during closing argument.

■ Third, the appellant complains that the State misquoted the evidence relating to the DNA test results. The State points out that the appellant objected upon the prosecuting attorney's discussion of the DNA test results. When the appellant objected, the prosecuting attorney immediately apologized in front of the jury for misquoting the evidence and then moved on to another topic. We do not find that the State's remarks in closing argument require reversal of the jury verdict.

## VIII.

■ The appellant also argues that the trial judge erred in permitting two witnesses, Thomas and Moore, to be interviewed and coached by the prosecution at the same time and in the same room after the trial court had ordered that all witnesses be sequestered.

> ments must be met; one, a specific intent to commit the robbery and two, an overt act toward the commission of the robbery which falls short of completing the robbery.

**8.** The appellant also argues that the trial judge erred by refusing 42 of appellant's instructions and in granting 11 of the State's instructions. However, since these issues were not adequately addressed in the appellant's brief, we decline to address these issues on appeal. *See* syl. pt. 3, *Higginbotham v. City of Charleston*, 157 W.Va. 724, 204 S.E.2d 1 (1974), *overruled on other grounds, O'Neil v. City of Parkersburg*, 160 W.Va. 694, 237 S.E.2d 504 (1977).

First, the trial judge did not permit the prosecution to interview Thomas and Moore at the same time. The trial judge was unaware that this had occurred until *after* the State had interviewed Thomas and Moore at the same time. Second, the trial judge responded to this violation of the sequestration order by (1) refusing to allow the State to introduce into evidence any previously undisclosed information which it became aware of as a result of this meeting; and by (2) advising the jury prior to Moore's and Thomas' testimony that they had jointly met with the prosecution prior to trial.

 This Court held the following in syllabus point 4 of *State v. Steele*, 178 W.Va. 330, 359 S.E.2d 558 (1987): "Where a State witness violates a sequestration order and is permitted to testify, the question on appeal is whether the witness's violation of the order and the ensuing testimony had a prejudicial effect on the defendant's case." The State argues that since Moore and Thomas had previously given statements to the police which could have been used to impeach their testimony, there was no error.

We agree that the violation of the sequestration order did not have prejudicial effect on the appellant's case. The trial judge cautioned the jury by stating the following before Moore and Thomas testified:

I wish to again advise the jury in assessing the credibility and the weight of the testimony of Bucky Moore you may consider the fact that on Sunday, July 25, the prosecuting attorney, David Hanlon, met with Glen Thomas and Bucky Moore together all three present at the same time and place, and the prosecuting attorney discussed with and questioned each of them, Glen Thomas and Bucky Moore, regarding their testimony and statements.

Additionally, Moore and Thomas had previously given statements to the police prior to violating the sequestration order which could have been used to impeach their testimony. Accordingly, the trial judge did not err by permitting Moore and Thomas to testify.

## IX.

 The appellant argues that a new trial should have been granted since a witness was discovered subsequent to the trial who saw the appellant and Brian Vincent at a different location at the time other witnesses claim to have seen them walking on a road near the victim's house.

 We are guided by principles set forth in syllabus points 1 and 2 of *State v. King*, 173 W.Va. 164, 313 S.E.2d 440 (1984):

1. 'A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from the facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.' Syllabus, *State v. Frazier*, 162 W.Va. 935, 253 S.E.2d 534 (1979), *quoting*, Syl. pt. 1, *Halstead v. Horton*, 38 W.Va. 727, 18 S.E. 953 (1894).

2. 'A new trial on the ground of after-discovered evidence or newly discovered evidence is very seldom granted and the circumstances must be unusual or special.' Syllabus Point 9, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966).

Additionally, we are mindful that the decision to grant a new trial is within the discretion of the trial court. *Id.* 173 W.Va. at 165, 313 S.E.2d at 442.

Our review of the record does not reveal that the testimony of the newly discovered witness is so unusual or special that it will produce an opposite result. Therefore, the trial judge did not err by refusing to award a new trial.

## X.

■ Lastly, the appellant complains that the jury verdict is contrary to the law and contrary to the weight and preponderance of the evidence. The appellant argues that the evidence against him was wholly circumstantial. Additionally, the appellant maintains that most of the evidence came from Moore and Thomas, and that Moore had obviously not been truthful. Thus, the jury did not have sufficient evidence to find the appellant guilty.

■ The appellant correctly states that most of the evidence against him was circumstantial. This Court has held the following about circumstantial evidence in syllabus point 4 of *State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983):

> ' "The weight of circumstantial evidence, as in the case of direct evidence, is a question for jury determination, and whether such evidence excludes, to a moral certainty, every reasonable hypothesis, other than that of guilt, is a question for the jury." Syllabus point 4, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967).' Syl. pt. 4, *State v. Meadows*, 172 W.Va. 247, 304 S.E.2d 831 (1983).

Our review of the record indicates that the jury had sufficient evidence to make a determination of guilt or innocence. There was evidence that the appellant and Brian Vincent were seen walking near the victim's house. There was also evidence that the two asked someone to provide an alibi. Additionally, Thomas and Moore testified that either Brian Vincent or the appellant told them that they had killed the victim. Also, an ax handle which was recovered in the woods had hair on it which was consistent with the victim's hair, and a .22 rifle which belonged to the victim was recovered from behind a school bus stop.

Moreover, the jury was instructed by the trial judge to keep in mind that "[c]ircumstantial evidence must always be scanned with great caution and can never justify a verdict of guilty unless the circumstances proved are of such character as to produce upon a fair and unprejudiced mind a moral conviction of guilt of the accused beyond a reasonable doubt." Accordingly, we do not find that the verdict against the appellant should be set aside.

## XI.

Since the appellant does not raise any errors which warrant reversal, we affirm the October 7, 1993 order of the Circuit Court of Ritchie County.

Affirmed.

BROTHERTON, J., did not participate.

CLECKLEY and FOX, JJ., deeming themselves disqualified, did not participate.

RANSON and BERGER, Judges, sitting by temporary assignment.

NEELY, C.J., dissents and reserves the right to file a dissenting opinion.

NEELY, Chief Justice, dissenting:

Treating a self-serving suicide note as the equivalent of a spontaneous declaration made in anticipation of imminent death lacks basic common sense. The dying declaration exception to the hearsay rule is used when the declarant is unavailable as a witness to admit "(2) Statement[s] under Belief of Impending Death. In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing that his death is imminent, concerning the cause or circumstances of what he believed to be his impending death." Rule 804(b)(2), *W.V.R.E.*

At common law, the dying declaration was used to allow the admission of statements by murder victims who, with awareness of their impending demise, used their dying breath to identify their assailant. Accordingly, justice was served by preventing a murderer from evading justice by virtue of his success in killing the victim. As noted by the majority, this exception has since been expanded to include civil actions, and does not require that the declarant be the subject of the litigation seeking to introduce the statement. In this case Mr. Moore was a prosecution witness who was present at trial and subjected to direct, cross, and recross before his self-inflicted death.

Mr. Moore was in complete control of the timing and circumstances of his death. The majority fails to distinguish the difference between Mr. Moore's suicide note, and a statement made by a person facing inevitable death due to circumstances beyond his control. If ever there is a time to put one's best face forward, it would be in a note that will literally stand for all eternity as one's last testament. A suicide note is the perfect opportunity to rewrite one's own history in a way calculated to impress one's final audience.

My objection is not intended to imply Mr. Moore was lying: rather, the idea that suicide notes should be viewed as admissible evidence under the dying declaration exception to the hearsay rule is misguided.

In addition, Mr. Moore's note did not make reference to the cause or circumstances of *his* death, as required by Rule 804(b)(2), *W.V.R.E.* Another unsolved mystery is when he actually wrote the suicide note. Although it was found in the room with his body, it was not dated. How can the majority infer that the undated note was actually crafted under the belief of impending death?

The majority has employed a number of assumptions as a matter of law, and clothed them with an indicia of reliability that are totally unwarranted. A suicide note is a product of a controlled act accompanied by a planned statement. It is simply not analogous to a statement made under the belief of impending death by a person with a total lack of control over the timing and causation of his death. Denying this difference is absurd. It's like comparing the image captured by a photojournalist covering a war, to a staged photograph of a battlefield reenactment.