484 S.E.2d 221

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**William BRADFORD, Defendant Below, Appellant.**

**No. 23454.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 1997.

Decided March 14, 1997.

---

C. Michael Griffith, Stacy & Griffith, Beckley, for Appellant.

Kristen Keller, Chief Assistant Prosecuting Attorney, Beckley, for Appellee.

MAYNARD, Justice.

Defendant, William Bradford, was convicted in the Circuit Court of Raleigh County, West Virginia, of second degree sexual assault and first degree murder with the use of a firearm. He was sentenced to life in prison without a recommendation of mercy. Defendant appeals his conviction, contending the trial court erred by admitting a statement elicited after he asserted his right to remain silent; by refusing to give an accessory after the fact instruction; by limiting cross examination; by the involvement of three different circuit judges in separate stages of the lower court proceedings; and by prosecutorial misconduct. After reviewing the record, we find the circuit court committed no reversible error. Therefore, we affirm the judgment of the lower court.

Defendant, William Bradford, was released from jail on November 5, 1994, after serving a seven-month sentence for grand larceny. The incarceration resulted from a plea entered to charges brought by his father, James Bradford. James Bradford's wife, Polly Bradford, later stated that she and James Bradford did not know the defendant had been released from jail.

On November 6, 1994, after attending to their flea market business in Princeton, Mercer County, West Virginia, Polly Bradford and James Bradford returned to their one-bedroom trailer in MacArthur, Raleigh County, West Virginia, at approximately 7:00 p.m. Due to the nature of the flea market business, James Bradford customarily carried a large amount of cash and a pistol, and Polly Bradford carried a .25 caliber pistol in her purse. She stated she had never fired the gun and did not know how to load or use it.

Polly Bradford stated the couple reached the porch of their trailer on the evening of November 6, 1994, and James Bradford began unlocking the front door. Suddenly, a shot rang out and she saw her husband fall back on the porch in a pool of blood. The trailer door was then pulled open and she heard a voice which she recognized as that of the defendant, William Bradford, telling her to get inside if she did not want the same thing. William Bradford was holding a rifle and it was pointed at Polly Bradford. The defendant ordered Polly Bradford to "sit down and not to move" and then, while "pacing back and forth," told her, "I'm taking everything here, including you."

William Bradford then went out to the porch to retrieve the pistol from his father's body, and shortly thereafter removed his father's keys and money from the body. When the defendant went outside, Polly Bradford tried to use the telephone, "but it was dead." State Police later found the telephone line had been disconnected from the outside of the trailer.

William Bradford repeatedly raped Polly Bradford throughout the night of November 6 and early morning of November 7, 1994, subjecting her to both genital intercourse and fellatio. At trial, Polly Bradford testi-

fied the defendant raped her, while the defendant testified the sex was consensual. Polly Bradford testified she submitted only because she believed if she resisted the defendant would have killed her.

During the course of the evening, the defendant requested that Polly Bradford run his bath water and find him a change of clothes, which she did. She made coffee and put a movie in the VCR. On one of the defendant's trips outside, Polly Bradford attempted to locate her husband's .38 pistol. When she could not find it, she reasoned the defendant must have it with him. She hid her .25 under the dresser, stating she feared the defendant would find it and get angry. The police later found a .303 rifle hidden under the sofa, which was subsequently determined to be the murder weapon.

Polly Bradford saw her husband's .38 when the defendant "stuck" it in the back of his pants and ordered her to go to the store with him to buy cigarettes. After buying cigarettes, the defendant drove back to the trailer. James Bradford's body was no longer on the porch. Later, on one of his many trips outside, the defendant burned several items in a trash barrel located on the property. Polly Bradford said she saw the defendant burn the jacket her husband was wearing at the time he was murdered, and State Police later recovered the burnt frame of the victim's glasses.

The next day, November 7, 1994, Polly Bradford and the defendant drove to the rented Princeton store where James and Polly Bradford operated their flea market business. The defendant put the .38 under the seat of the truck where he left it when they arrived at the store. Polly Bradford had packed an ice chest of food to take along, as was her usual custom. While the defendant was fixing a sandwich in the back room, Polly Bradford found her extra key to the truck. She ran to the vehicle and drove to the Princeton City Police Department.

Polly Bradford reported to the Princeton City Police that her husband had been killed at their home in MacArthur in Raleigh County by her stepson, William Bradford. She told the police she believed the body was still there. At that time, she gave the police the .38 pistol and approximately $1,195.00 in cash. She directed them to the store where she had left the defendant; however, when the police arrived, the defendant was gone. The Princeton Police Chief testified at trial that Polly Bradford was excited and appeared to be frightened.

The Princeton City Police contacted the West Virginia State Police to investigate. When the State Police arrived at the Bradford property, they did not find the defendant, but they did find blood on the front porch and blood on the grass on the left side of the porch. They also found that the front door had been pierced by a small projectile. An orange curtain which was mounted on the inside of the door had gun powder residue on it, indicating a shot had been fired from inside the trailer and through the door.

A bloody axe and wheelbarrow were found approximately 150 feet from the trailer in a shed. Four bloody banana boxes were found and these contained the remains of James Bradford, dismembered into twenty-one pieces. A crime scene video was introduced at trial, but the State redacted the portion of the video showing the trooper opening the four boxes. Therefore, the jury did not view any part of the victim's dismembered body.

At the crime scene, located next to the banana boxes, was a bag of the defendant's belongings, including jail release forms in his name. There were letters addressed to the defendant, including a love letter from a woman in North Carolina confirming the defendant's plans to travel there upon release from jail. Directions to the North Carolina residence were found in the same bag.

At the defendant's trial, Sergeant Satterfield testified that during the initial investigation, they searched a recreational vehicle (RV) located on the defendant's father's and stepmother's property which had no keys in the ignition. After the State Police left the property and returned to conduct a second search, Sergeant Satterfield again entered the RV and immediately noticed keys in the ignition. The Sergeant turned to find the defendant hiding under a table in the back of the RV. The defendant's first words were "I give up, Captain."

Trooper C.E. Tilley promptly read the defendant *Miranda* warnings.[1] The defendant refused to cooperate.[2] He was transported to the Beckley State Police Detachment, where he was placed in the custody of Trooper S.F. VanMeter. The defendant stated that he usually did not talk to police, but he would talk to Trooper VanMeter. The officer again read *Miranda* warnings to the defendant, who again refused to sign the *Miranda* warnings form and stated that he knew his rights. The defendant then initiated a conversation by asking, "Am I the only one under arrest for murder?" Trooper VanMeter asked the defendant if he minded if the trooper took notes. The defendant testified that he told the trooper to "[t]ake all the notes you want to." These contemporaneous notes were introduced into evidence.[3]

Trooper VanMeter asked the defendant if he knew how the body got the way it was, referring to the dismemberment, to which the defendant responded, "I'm done talking." At that time, the trooper asked the defendant if he could review his notes, to which the defendant nodded his head and answered in the affirmative. He continued to communicate with the officer by nodding and talking. The officer understood the defendant did not want to talk about the dismemberment.

At trial, the defendant testified that after his release from jail on November 5, 1994, he went to his father's home and hid in a RV adjacent to an outbuilding to observe the comings and goings of his father and stepmother until an opportunity arose to speak to his stepmother alone. He stated he wanted to recover property in the possession of his father, if discussions with his stepmother indicated his father's mood was amiable to such. He stated he watched his father leave on the evening of November 6, 1994, after which he approached Polly Bradford. After talking to Polly, he felt there was no problem with his father.

The defendant testified that Polly Bradford told him his father had gone to the store. He stated he and Polly had had previous sexual relations and were having sexual intercourse on the sofa in the living room of the trailer when he saw the lights of his father's vehicle approaching. He went to the back door of the trailer leaving Polly naked on the couch. He testified he heard a shot. When he returned to the living room, he discovered Polly Bradford holding a rifle. He looked through the window of the door and observed the body of his father on the porch.

The defendant testified he felt he was closely involved with the murder, so he determined he would assist Polly Bradford in escaping detection for the crime. He admits he removed the body from the porch in a wheelbarrow into an outbuilding. He and Polly drove to a convenience store where he bought cigarettes; later, upon returning to the trailer, they had additional sexual relations after which he bathed and she showered. He asked for something to eat, so she fixed him supper and they slept in the same bed. He stated that he assured Polly he would take care of disposing of the body.

The defendant testified that the next day, November 7, 1994, he discovered the axe and the cardboard fruit boxes in the outbuilding. He dismembered his father's body and placed the body parts in four banana boxes, then stacked the boxes together and covered them with a tarp.

The state medical examiner testified the cause of death was a single bullet entering the victim's collarbone and exiting through his back, and that the dismemberment was post-mortem. The pathologist explained the fact that the decedent was dismembered into

---

**1.** *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** After reading the defendant his rights, the police asked for identifying information to complete the form, to which the defendant replied, "[T]his is what Trooper Zirkle would call uncooperative—f___ you, f___ all you motherf_____." (Tr. 430).

**3.** Reading from his notes, Trooper VanMeter testified the defendant stated, "VanMeter, this is straight up. I'm looking at murder and a lot of time. I did it, but there's pussy involved." When asked if he was referring to Polly Bradford, the defendant responded, "Yes, and the pussy wasn't worth a f___." When asked if his father deserved to die that way, he responded, "The motherf_____ got what he deserved."

twenty-one pieces was critical evidence that the manner of death was homicide.

The defendant was indicted for the first degree murder of his father by use of a firearm. The defendant was also indicted for the second degree sexual assault of Polly Bradford. Following a jury trial, the defendant was convicted on all charges. The jury made no recommendation of mercy. The defendant was sentenced to one life term in the penitentiary without possibility of parole upon the murder conviction and to ten to twenty-five years for the sexual assault conviction and to a minimum of three years for the firearms finding. The sentence was entered by order of the circuit court on September 18, 1995. The defendant appeals from this final judgment order.

■ On appeal, the defendant complains the statements he made to police after he asserted his right to remain silent were admitted at trial in violation of the Fifth Amendment to the United States Constitution and Article 3, § 5 of the West Virginia Constitution. He contends the arresting officers should have known he intended to remain silent when he refused to answer questions and to sign *Miranda* waivers. He states that he made his intent clear by the use of expletives.[4]

During an *in camera* hearing, Trooper VanMeter testified the defendant was read *Miranda* warnings a second time. We noted earlier the defendant refused when he was asked to sign the *Miranda* waiver, after which he initiated conversation with Trooper Van Meter. At trial, the defendant admitted he told the trooper to "[t]ake all notes you want to." After the defendant made a statement about money he had hidden on his father's property, Trooper VanMeter made a decision to videotape the remainder of the statement. The defendant willingly answered the questions he was asked until he was questioned about the dismemberment, to which he answered, "I'm done talking." At that time, the trooper inquired whether he was through discussing the dismemberment and asked if he could review the notes he had

written. The defendant nodded his head and answered that it was okay with him.

Trooper VanMeter testified that while he reviewed his notes, the defendant nodded agreement or continued to talk. The trooper stated it was obvious to him that the defendant "just didn't want to talk about the dismemberment," and he limited the discussion of the notes to the incriminating statements made by the defendant before he said, "I'm done talking."

At trial, defense counsel made a continuing objection to the admission of the officer's notes and the videotape on the basis of improper questioning. The court held an *in camera* hearing, in which Trooper VanMeter testified and was cross-examined, and the videotape was viewed by the court. The next day the court ruled the statement was admissible, stating "I don't believe that the—that the statement of the defendant on the tape that he didn't want to talk about that anymore, is sufficient to meet the requirements of Miranda."

We again note the defendant admits he indicated his willingness to talk to Trooper Van Meter upon being taken to police headquarters but complains he clearly indicated he wished to cease communicating when he stated, "I'm done talking." He does not question the admission of statements or the confession made prior to this comment. He only contends that answers given to any questions and the videotape made after he asserted his right to remain silent should not have been admitted into evidence. He provides us with no specific examples of improper questions; he merely makes a blanket complaint that the police continued to question him, reviewing prior statements and his admission to involvement with the crime.

In reading the record, we find no motion indicating either side requested the videotape be transcribed. Consequently, there is no transcript of the interview for us to review. Even though the video was reviewed by the trial court and admitted at trial, the exhibits were not submitted to us on appeal.

■ The trial court is in a superior position to know what transpired because it has

4. See footnote 2 for the language the defendant refers to here.

before it the witnesses who have firsthand knowledge of the events. *See State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994). We believe the defendant's assertion of his right to remain silent was sufficiently vague so the trial court could have properly concluded the defendant only refused to discuss the very gruesome dismemberment of his father, but that he was willing to talk freely and voluntarily about all the other facts and circumstances of the case, especially since he admittedly gave Trooper VanMeter permission to review his notes. The trial court committed no reversible error in admitting the statement given to police by the defendant. A trial court's decision regarding the admission of statements made by a defendant will not be disturbed on appeal unless the admission is clearly wrong. This Court has said, "To assert the *Miranda* right to terminate police interrogation, the words or conduct must be explicitly clear that the suspect wishes to terminate all questioning and not merely a desire not to comment on or answer a particular question." Syl. pt. 5, *State v. Farley,* 192 W.Va. 247, 452 S.E.2d 50 (1994).

The defendant urges us to apply *State v. Bradley,* 163 W.Va. 148, 255 S.E.2d 356 (1979), and *State v. Rissler,* 165 W.Va. 640, 270 S.E.2d 778 (1980). These cases are distinguishable. The issue in Bradley was whether oral admissions given to police officers should have been suppressed at trial when the defendant expressly requested that he be allowed to speak with an attorney prior to giving the statements and the police made little effort to acquire an attorney. The defendant made specific requests for counsel at least two times, but was questioned without counsel being present. This Court held that no interrogation can be conducted until counsel is secured when a criminal defendant requests counsel.

In *Rissler,* the defendant was arrested for breaking and entering. The arrest took place in an orchard. The defendant was orally advised of his rights by a policeman who recited from memory while the defendant was walking. There was no determination the rights were given in proper form and substance or that the defendant fully under-

stood or that he waived his rights. This Court concluded

> that upon the facts of this case, where contemporaneous with the appellant's arrest and while walking with the arresting officers to the police cruiser the appellant was advised of his rights, the prosecution failed to meet its burden of showing by a preponderance of the evidence that the accused had effectively waived his rights. . . .

*Rissler* at 647, 270 S.E.2d at 782–83.

In the case at bar, the defendant did not ask for an attorney. His rights were read to him from a form and accuracy is not questioned. He specifically stated he would talk to Trooper VanMeter. He told the trooper it was okay to take notes and agreed the notes could be reviewed. Given the facts of this case, we cannot say the trial court abused its discretion in admitting the videotape into evidence.

 Next, the defendant contends the trial court improperly refused to give an instruction on accessory after the fact as a lesser included offense or as a defense theory instruction. He also alleges he was prejudiced by the court's refusal to include accessory after the fact as an option on the verdict form. The State argues no reversible error was committed because the instruction was a misstatement of the law and there was insufficient evidence to support a verdict of guilty to accessory after the fact.

In *State v. Petry,* 166 W.Va. 153, 156–57, 273 S.E.2d 346, 349 (1980), this Court discussed the distinctions among principals and accessories:

> At common law the parties to a felony were divided into principals and accessories. The principals were divided into: (1) principals in the first degree who actually perpetrated the act; and, (2) principals in the second degree, known under early common law analysis as accessories at the fact, who were actually or constructively present at the scene of the crime and who aided or abetted directly or indirectly. The accessories were divided into: (A) accessories before the fact who conspired with the perpetrator but were not present

during the commission of the crime; and, (B) accessories after the fact who rendered assistance after the crime was completed. R. Perkins, *Criminal Law* 643–44 (1969); W. LaFave & A. Scott, *Criminal Law* § 63 (1972); 4. W. Blackstone, *Commentaries on the Laws of England* 33 (1765); and, *State v. Scott,* 80 Conn. 317, 68 A. 258 (1907)....

In *Petry,* we overruled the distinction between principals and accessories before the fact. The distinction between principals and accessories after the fact is maintained because an "accessory after the fact, by virtue of his involvement after the completion of the felony, is not treated as a participant in the felony but rather as one who obstructed justice." *Petry* at 157, 273 S.E.2d at 349. In fact, "[t]hree things are requisite to constitute one an accessory after the fact: (1) The felony must be completed; (2) he must know that the felon is guilty; and (3) he must receive, relieve, comfort or assist him." 1A M.J. *Accomplices and Accessories* § 5 (1993).

■ A principal is a criminal actor who actually perpetrates a crime. *State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980). An accomplice is usually defined as a person "who knowingly, voluntarily and with common intent unites with the principal offender in the commission of a crime." Black's Law Dictionary 17 (6th ed.1990).

An accessory is one not present at the commission of the offense, but who is in some way concerned therein, either before or after, as contriver, instigator or advisor or as a receiver or protector of the perpetrator. There can be no accessory to a crime not committed by a principal.

An accessory before the fact is one who being absent at the time of a crime, procures, counsels, commands or abets another to commit it. Absence at the time and place of the principal offense is necessary to make one an accessory before the fact. The connivance and the result aimed at must occur, and the latter must be the effect of the former in order to complete the crime of accessory before the fact....

An accessory after the fact is a person who knowing a felony to have been committed by another, receives, relieves, com-

forts or assists the felon. The accessory after the fact, by virtue of his involvement after the completion of the felony, is not treated as a participant in the felony but rather as one who obstructed justice.... It is necessary that the accessory have notice, direct or implied, at the time he assists or comforts the felon, that he has committed a felony.

1A M.J. *Accomplices and Accessories* § 5 (1993).

■ In syllabus point 12 of *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994), this Court set forth the standard which applies to accessory after the fact instructions:

Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution.

This Court has also said,

The test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense.

Syllabus point 1, *State v. Louk,* 169 W.Va. 24, 285 S.E.2d 432 (1981).

The crime of first degree murder is defined in W.Va.Code § 61–2–1 (1991), as:

Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance....

This statute does not define the elements of first degree murder. However, this Court has said "where there has been an unlawful homicide by shooting and the State produces

evidence that the homicide was a result of malice or a specific intent to kill and was deliberate and premeditated, this is sufficient to support a conviction for first degree murder...." *State v. Hatfield,* 169 W.Va. 191, 198–99, 286 S.E.2d 402, 408 (1982). These elements of first degree murder are certainly different from the elements necessary to prove accessory after the fact. As noted above, to prove accessory after the fact one must prove the felony was completed, the accessory knew the felon was guilty, and the accessory received, relieved, comforted or assisted the felon.

The defendant concedes the offense of accessory after the fact does not meet the *Louk* test in this instance, because of the inclusion of additional elements. To be an accessory after the fact one must prove he was not present when the crime was committed and also must prove that he assisted the principal perpetrator by one of the above enumerated acts. Since these elements need not be proven to convict for murder, we conclude the offense of accessory after the fact cannot be a lesser included offense to murder.

■ The central problem the defendant has with this point is that the instruction offered here, Defendant's Instruction 20,[5] is simply not a correct statement of the law in that it omits the essential element of the accessory's absence at the time and place of the crime. "A trial court's refusal to give a requested instruction is reversible error only if ... the instruction is a correct statement of the law...." Syl. pt. 11, in part, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994). The defendant's own version of the facts is that he was present in the hallway adjoining the living room of a small one-bedroom trailer when the shooting occurred in the living room. The court in its discretion reasonably found there was no evidence the defendant was absent at the time and place of the crime. And even though the defendant mentioned the actions he took after the murder were to protect Polly Bradford, he repeated-

ly testified these actions were taken to avoid his own arrest for murder. The court's refusal to give the proferred instruction was not an abuse of discretion and constitutes no reversible error. Accordingly, we find the trial court did not abuse its discretion in failing to instruct the jury on accessory after the fact.

■ On appeal, the defendant also alleges the trial court limited the cross-examination of Polly Bradford, violating the confrontation clause of the Sixth Amendment of the United States Constitution and Article III, § 14 of the West Virginia Constitution. The defendant complains that he was not allowed to examine Polly Bradford at trial regarding supposed marital discord between herself and the victim. He claims this information would have shown motive or opportunity that Polly Bradford may have had to kill the victim.

The trial court ruled that unless and until the defendant provided evidence directly linking Polly Bradford to the murder, cross-examination as to any supposed motive on her part would not be permitted. In reading the record, we find the trial court expressly ruled the defense could recall Polly Bradford for additional cross-examination if any evidence was presented linking her to the crime.

■ Defense counsel originally claimed there would be three witnesses to testify as to supposed marital discord between Polly Bradford and James Bradford, which would provide motive on the part of Polly Bradford to murder the victim. However, at trial only the defendant testified in his own behalf, and defense counsel conceded the only evidence linking Polly Bradford to the murder would be the defendant's testimony.

"In a criminal case, the admissibility of testimony implicating another party as having committed the crime hinges on a determination of whether the testimony

---

**5.** Defendant's Instruction 20 reads as follows:

The Court instructs the jury that an accessory after the fact is one who after the commission of a crime aids or assists the perpetrator to avoid punishment or prosecution. Therefore, if you find from the evidence that William

Bradford aided or assisted Polly Bradford to avoid prosecution or punishment for the crime of Murder, then you can find William Bradford guilty of no greater offense than accessory after the fact of Murder as alleged in Count II of this indictment. W.Va.Code 61–11–6.

tends to directly link such party to the crime, or whether it is instead purely speculative. Consequently, where the testimony is merely that another person had a motive or opportunity or prior record of criminal behavior, the inference is too slight to be probative, and the evidence is therefore inadmissible. Where, on the other hand, the testimony provides a direct link to someone other than the defendant, its exclusion constitutes reversible error." Syl. Pt. 1, *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146 (1980).

Syl. pt. 2, *State v. Malick*, 193 W.Va. 545, 457 S.E.2d 482 (1995).

The defendant's only allegation of supposed prior marital discord was the claim that five years earlier Polly Bradford had left James Bradford for two weeks. The defendant admitted during cross examination he had no knowledge of the relationship within the year preceding the murder.

The only testimony linking Polly Bradford to the crime was the defendant when he testified on direct that "[he] heard a bang.... [He] peeped around the corner, and [Polly] was standing in the living room with the rifle." The defense then rested without calling other witnesses and without recalling Polly Bradford to attempt to attack her on the issue of supposed motive. Accordingly, the defendant waived any claim that he was denied his right to confront Polly Bradford on the issue of her supposed motive.

The defendant also alleges he was prejudiced by prosecutorial misconduct in that his use of foul language and the unpleasant events that took place after the murder were unduly emphasized. He complains the prosecutor on two occasions referred to the Bible during closing argument and commented on the defendant's assertion of his right to silence.

█ In reading the trial transcript, we find defense counsel referred to the defendant's use of foul language with very much the same frequency as the prosecution. The defendant can hardly complain now that the prosecution repeated the foul language. In fact, at one point the defendant asserted that

the police should have known by the expletives he used the night he was questioned that he wished to remain silent. He certainly cannot use the foul language to his advantage when it is convenient for him to do so and then complain he is prejudiced when the prosecution refers to the same foul language.

█ The defendant claims the State overemphasized an unpleasant event, the dismemberment of his father. After *in camera* hearings, the trial court correctly ruled the evidence of the dismemberment and concealment of the victim's remains was more probative than prejudicial, especially insofar as it tended to prove the defendant's state of mind toward the victim and insofar as such destruction of evidence tended to prove the defendant's consciousness of guilt. Photographs of the boxes were allowed into evidence, but anything beyond that was considered too prejudicial, both in the police photographs and on the video of the crime scene. The defendant, during direct examination, testified about the dismemberment of his father and the court ruled the defendant could be cross examined on evidence he gave on direct examination.

The State did not attempt to offer any photographs of the victim's dismembered body or of the reconstructed body from the State Medical Examiner's Office. The crime scene video was redacted so jurors did not see the body parts. No graphics of the specific nature of the dismemberment were offered. The four bloody boxes were not brought into the courtroom. The Medical Examiner was cautioned not to go into detail as to the mutilation of the body. We find the trial court was very careful in excluding anything that might be so gruesome as to be prejudicial, and in so doing committed no reversible error.

█ The defense failed to object at trial to the State's reference to the Bible. Only after the jury notified the court that a verdict had been reached, did defense counsel move for a mistrial. " ' "Where objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal."

Syllabus Point 1, *State Road Commission v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964).' Syllabus point 3, *O'Neal v. Peake Operating Co.,* 185 W.Va. 28, 404 S.E.2d 420 (1991)." Syl. pt. 10, *State v. Satterfield,* 193 W.Va. 503, 457 S.E.2d 440 (1995).[6]

 Lastly, the defendant complains the cumulative effect of using three separate judges at critical stages of the proceedings resulted in prejudice which denied him due process and a fair trial. Judge Ashworth presided over the defendant's bond hearing and one pre-trial hearing, while pre-trial motions were heard by Judge Lilly, and Judge Canterbury presided over the trial. The defendant argues that Judge Lilly did not rule but indicated certain evidence would not be admitted at trial; however, the trial judge admitted the evidence, which rendered the pre-trial motions hearing meaningless. He complains counsel had prepared for trial based on the earlier indications of the court and had to respond to the admission of this evidence without proper preparation.

The defendant cites no authority, and, indeed, we know of no authority that stands for the proposition that due process requires a single judge to preside over all stages of a criminal proceeding. We also note the defendant failed to file a motion of disqualification pursuant to Trial Court Rule XVII.

In summary, this Court cannot find the trial court committed reversible error in this case. Accordingly, we conclude the judgment of the Circuit Court of Raleigh County should be affirmed.

The judgment of the Circuit Court of Raleigh County is therefore affirmed.

Affirmed.

---

6. We previously discussed at length the assigned error regarding the State's comment on the defendant's assertion of his right to silence.